JONES, Justice.
This case, involving the drilling of an oil well as an exception from the general spacing rules, presents a question as to whether Section 6132-21 (c), Mississippi Code 1942 Annotated (Supp.1968) renders the drilling of a well as an exception, absolutely and totally immune from the provisions of general rule No. 14 adopted by the State Oil and Gas Board insofar as allowa-bles are concerned. The judge of the Circuit Court of Hinds County, Mississippi, held that it did. We disagree and reverse.
Section 6132-21 (c), Mississippi Code of 1942 Annotated (Supp.1968) reads as follows :
Each well permitted to be drilled upon any drilling unit shall be drilled in accordance with the rules and regulations promulgated by the board and in accordance with a spacing pattern fixed by the board for the pool in which the well is located with such exceptions as may be reasonably necessary where it is shown, after notice and upon hearing, that the unit is partly outside the pool or, for some other reason, a well otherwise located on the unit would be nonproductive, or topographical conditions are such as to make the drilling at such location unduly burdensome. Whenever an exception is granted, the board shall take such action as will offset any advantage *858 .which the person securing the exception may have over other producers by reason of the drilling of the well as an exception, but no well drilled and completed as an exception to prescribed footage limitations for the reason that a portion of the drilling unit upon which such well is located is partly outside the pool or productive horizon shall be allocated a reduced daily production allowable whenever it shall be demonstrated to the satisfaction of the board that the productive acreage underlying such drilling unit is equal to, or more than, the reasonable minimum amount of productive acreage which would underlie such drilling unit under the minimum conditions which would permit the drilling of a well thereon so located as to comply with all applicable footage limitations; * * *
It is not denied that the well was drilled as an exception and complied with the above statute except that part which says, “Each well permitted to be drilled upon any drilling unit shall be drilled in accordance with the rules and regulations promulgated by the board * *
Rule 14 of the General Rules affecting the entire state is applicable to this well, there being no special rules for this particular field. Rule 14 reads, insofar as affects this issue, as follows:
(b) No well shall cross drilling unit lines unless permit is obtained from the Board after notice and hearing.
(c) Intentional deviations of short distances necessary to straighten the hole, sidetrack, junk, or correct other mechanical difficulties may be accomplished without the issuance of a permit, but the operator shall immediately notify the Board by letter or telegram of the fact thereof.
(d) Except as set forth in paragraphs (c) and (e) hereof, no well may be directionally deviated from its normal course unless authorization so to do is first obtained from the Board after notice and hearing.
(e) In the event an operator in good faith commences and proceeds with the drilling of a straight well and thereafter, for reasons acceptable to the operator, desires to directionally deviate the well, he may do so at his own risk, first notifying the Board by letter or telegram of the fact thereof. On completion of such well as a producer, the operator must immediately apply for a permit from the Board on notice and hearing for approval of such intentional deviation. Pending such approval or disapproval, the Board may assign a temporary allowable only to such well.
(f) In cases of directionally deviated drilling the Board shall have the right to assess appropriate allowable penalties to prevent undue drainage from offset properties and to adjust possible inequities caused by the directional drilling.
We need not detail the manner in which J. W. Harris, appellee, acquired the right to drill the exception well. He secured a permit from the Oil and Gas Board, employed drillers and proceeded to drill. The Smackover Sands at this point were approximately 12,600 feet to 12,800 feet below the surface. When the well had been drilled to about 10,000 feet, it was found to have drifted (or deviated) a considerable distance to the northeast. This was toward a dry hole which had been drilled in the approximate center of the forty from which the exception was carved and in which the exception well is located.
At this point, the operator, with the assistance of a drilling firm which specialized in directional drilling, changed the direction of the well, turning it approximately 180 degrees. The well then ran in a southwesterly direction practically to the point of intersection of the three drilling units upon which appellants had wells.
The permit authorized the drilling of said exception well at a point 300 feet north of *859 the south line and 300 feet east of the west line of the forty upon which it was drilled, to-wit: the northwest quarter of northwest quarter, section 26, township 10 north, range 6 west, Wayne County. Stack and Chisholm operating as the Brandon Company had 3 producing wells, one located in the northeast quarter of northeast quarter of section 27, township 10 north, range 6 west; one in the southeast quarter of northeast quarter of said section 27 and one in the southwest quarter of northwest quarter of section 26. The operator had complied with the rules and regulations by giving notice of the fact that he was intentionally deviating the well. At one time when the bottom of the hole was located, it was in the northeast quarter of northeast quarter of section 27, being the unit where the Brandon well 27-1 was situated. Upon ascertaining this fact, the pipe was pulled and the hole plugged. The specialized directional drilling firm was rehired and redrilled the well to the east bottoming it at a point approximately 31 feet from the east line of the northeast quarter of northeast quarter and near the north lines of the two other quarter-quarter sections here-inbefore mentioned. It was practically at the junction of the four drilling units and close to the line of each of the 3 Brandon well units.
All of the wells were pumpers. Harris, the operator of the exception well, made application to the State Oil and Gas Board to approve the well as drilled with the intentional deviations and with the bottom of the hole situated as described above.
Rule 35 of the General Rules places the allowables on a depth basis. At a depth of 12,000 feet the allowables were 400 barrels daily.
The Oil and Gas Board approved the well as completed, but, provided that, because of the intentional deviations and the location of the bottom of the well, the exception well should have an allowable of only 150 barrels per day.
From this order, Harris appealed to the Circuit Court of Hinds County and secured from the circuit judge a supersedeas making bond as required by the circuit judge. On the hearing before the circuit court, the judge held that Code Section 6132-21 (c) was controlling as to the allowable and that the Oil and Gas Board exceeded its authority in applying Rule 14 and reducing the allowable from 400 barrels to 150 barrels because of the intentional deviation and bottoming of the well where it was.
The circuit judge held that Section 6132— 21(c), Mississippi Code 1942 Annotated (Supp.1968) controlled and under no circumstances could the Oil and Gas Board reduce the allowable.
Testimony from experts on both sides established clearly that the said exception well with the bottom located where it was, would drain from all 3 of the appellants’ wells. The board was fully justified in believing this. The only defense to such drainage asserted by the appellee was that prior to the drilling of said exception well, the other wells had drained from his land. Of course, the rule of capture applied, and the oil taken by the other 3 wells was legally produced and could not be used to offset drainage from the said exception well. Plaintiff’s well 27-1 was 842 feet from the bottom of the exception well; No. 27-8 was 943 feet from the hole of the exception; and No. 26-5 was 1207 feet from the bottom of said hole. It was testified by some of the experts that if the pressure equalized between the bottom of the exception well and the other wells, the drainage would extend half the distance to the other wells.
Section 6132-01, Mississippi Code 1942 Annotated (1952) declares the policy of the state as to oil and gas in these words:
It is hereby declared to be in the public interests to foster, encourage and promote the development, production and utilization of the natural resources of oil and gas in the state of Mississippi; and to protect the public and private in *860 terests against the evils of waste in the production and utilization of oil and gas, by prohibiting waste as herein defined; to safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom; * * *
In Section 6132-08, Mississippi Code 1942 Annotated (1952) under “Definitions” waste shall mean and include the following:
(3) Abuse of the correlative rights and opportunities of each owner of oil or gas in a pool due to non-uniform, disproportionate, or unratable withdrawals causing undue drainage between tracts of land or resulting in one or more owners in such pool producing more than his just and equitable share of the production from such pool.
Section 6132-09, Mississippi Code 1942 Annotated (1952) declares that waste as defined in the act is unlawful.
Section 6132-31, Mississippi Code 1942 Annotated (1952) provides:
Owners or operators of oil or gas wells shall, before connecting with any oil or gas pipe line, secure from the board a certificate showing compliance with the conservation laws of the state and conservation rules, regulations and orders of the board. No operator of a pipe line shall connect with any well until the owner or operator of such well shall furnish a certificate from the board that such conservation laws and such rules, regulations and orders have been complied with; provided, this section shall not prevent a temporary connection of not more than seven (7) days’ duration with any well in order to take care of production and prevent waste until opportunity shall have been given the owner or operator of such well to secure such certificate.
The board shall have the power to cancel any certificate of compliance issued under the provisions of this section when it appears, after due notice and hearing, that the owner or operator of a well covered by the provisions of same has violated or is violating, in connection with the operation of said well or the production of oil or gas therefrom, any of the oil or gas conservation laws of this state or. any of the rules, regulations or orders of the board promulgated thereunder.
The board is an arm of the state empowered by the legislature to prescribe rules and regulations for achieving in practice this policy of the state as announced in Section 1 of the Act and to enforce, maintain and carry out the said policy of the state. The powers granted to the board are in Section 6132-10, Mississippi Code 1942 Annotated (Supp.1968), and are as follows:
(a) The board shall have jurisdiction and authority over all persons and property necessary to administer and enforce effectively the provisions of this act and all other acts relating to the conservation of oil and gas.
H* ^ 'K
(c) The board shall have the authority, and it shall be its duty, to make, after notice and hearing as hereinafter provided, such reasonable rules, regulations and orders as may be necessary from time to time in the proper administration and enforcement of this act, and to amend the same after due notice and hearing, including, but not limited to rules, regulations and orders for the following purposes:

(2) To require the making of reports showing the location of oil and gas wells; and to require the filing within thirty (30) days from the time of the completion of any wells drilled for oil or gas, of logs and drilling records.
*861 if: 3jc s{:
(12) To allocate and apportion the production of oil or gas, or both, from any pool or field for the prevention of waste as herein defined, and to allocate such production among or between tracts of land under separate ownership in such pool on a fair and equitable basis to the end that each such tract will be permitted to produce not more than its just and equitable share from the pool;. * *
(13) To prevent, so far as is practicable, reasonably avoidable drainage from each developed unit which is not equalized by counterdrainage.
There is no claim that the board did not have the right to make Rule 14. The only claim being, as heretofore stated, that the said section of the Code providing for full allowables renders the exception well absolutely immune from any action in the reduction of allowables regardless of what happens. We cannot condone or approve such a contention. Section 6132-21(c) contemplates, as shown by the section itself, that the well shall be drilled in accordance with the rules and regulations, and applies only in cases where the driller or operator does drill his well in accordance with such rules and regulations. If it is drilled in accordance with such rules and regulations, and there is no question about it, then the allowable cannot be reduced because it is an exception, but where it is not so drilled, the said section does not apply.
It would be a bizarre situation if the State Oil and Gas board could reduce the allowable of an oil well on a regular unit, but could not for any reason protect the equitable rights of other co-owners in the common pool by such a reduction, when the driller has violated the rules and regulations, or has intentionally deviated his well and bottomed it so that it collides with and defeats the policy of the state as announced by said Act.
The said Rule 14, sections (c), (d), and (e), shows that it is contemplated that the hole shall be, as nearly as possible or reasonable, a straight hole and shall not meander around as this hole did. Section (e) provides that if an operator in good faith commences and proceeds with the drilling of a straight well and desires to directionally deviate the well, he may do so at his own risk, first notifying the board. On completion of such well as a producer, the operator shall immediately apply for a permit from the board for approval of such intentional deviation. The board would have the right to approve or disapprove, and, if they had such rights, they certainly had the right to approve subject to a penalty such as is here involved, so as to offset any advantage that the exception well would gain over the wells adjacent.
They are charged with the duty of protecting both the public and the individual owners in oil and gas matters, and, if they should have no right to approve subject to a penalty, their only course would be to decline to approve and refuse to issue a compliance certificate which would enable the operator to dispose of his production on the market. If they failed to approve and failed to issue a certificate of compliance, the operator of the exception well would be totally deprived of any production, because he could not dispose of it. The board, in attempting to be fair to him and to the adjacent owners, sought to do equity by granting approval but reducing the allowa-bles so that there would be compensation for the improper location of the bottom of the well.
As to “intentional” deviation, it is stated in 58 C.J.S. Mines and Minerals § 241, pages 680-681 (1948) that:
Various statutes provide for the enforcement of regulations concerning the operation of mines and wells and afford remedies for the violation thereof. Mere failure to do a required act is sufficient to render one answerable to a statute punishing “any violation” thereof. The conscious failure to observe and comply with the provisions of a statute, even *862 though no evil intent induces the failure, is sufficient to constitute a willful violation thereof. Under a statute making miners who shall “intentionally” do certain things guilty of a misdemeanor, the word “intentionally,” as so used, requires only that the act constituting the alleged violation of the statute shall be “knowingly” done.
There is no claim here that the operator did not know of this directional deviation.
In accordance with our views as herein-before stated, we are reversing the circuit court as to the main issue and also as to the order releasing the surety on super-sedeas bond from liability. We are reinstating the order of the State Oil and Gas Board and remanding the case to the State Oil and Gas Board for such other appropriate action as may be deemed necessary, if any.
Reversed, order of Oil and Gas Board reinstated, and remanded to Oil and Gas Board.
GILLESPIE, P. J., and PATTERSON, SMITH, and ROBERTSON, JJ., concur.