258 So.2d 767 (1971)
The STATE OIL & GAS BOARD et al.
v.
MISSISSIPPI MINERAL & ROYALTY OWNERS ASSOCIATION et al.
No. 46265.
Supreme Court of Mississippi.
June 28, 1971.
Dissenting Opinions August 10, 1971.
Rehearing Denied March 6, 1972.
A.F. Summer, Atty. Gen., by Carl F. Andre, Asst. Atty. Gen., John M. Grower, Brunini, Everett, Grantham & Quin, Heidelberg, Woodliff & Franks, Jackson, Vernon L. Terrell, Jr., New Orleans, for appellants.
Michael R. Eubanks, Lumberton, Williams & Williams, Poplarville, for appellees.
PER CURIAM:
After due, legal and proper notice, and after a full hearing, the State Oil and Gas Board of Mississippi amended its Statewide Rules 7 and 8, widening and increasing the spacing pattern for oil and gas wells drilled below 12,000 feet and in the Pennsylvanian and older formations below a measured depth of 3500 feet, to a drilling unit of 80 acres for an oil well and a drilling unit of 640 acres for a gas well.
Issue was joined by the Mississippi Mineral and Royalty Owners Association, which consists of several hundred members from all sections of Mississippi and a number of nonresidents who own oil, gas and minerals in the great majority of the producing fields in Mississippi and other mineral and royalty owners, in the Answer and Contest. On behalf of all of these protestants, the Association answered and contested the Petition of Shell Oil Company for wider spacing, and joined in all phases of the hearing before the Board.
The Association appealed from the Orders of the Board, amending Statewide Rules 7 and 8, to the Circuit Court of *768 Pearl River County. Without opinion and in a short Order, the Circuit Court found that:
"[T]he decision and orders amending Statewide Rule No. 7 and Statewide Rule No. 8 are in error, and are contrary to law, and are not supported by substantial evidence and should be reversed."
The Court then proceeded to order and adjudge that:
"[T]his cause be, and the same is hereby, reversed, and the petitions of Shell Oil Company et al to amend Statewide Rules 7 and 8 be, and the same are hereby, denied and dismissed, with prejudice."
Shell Oil Company and others who joined in its petition, as well as the State Oil and Gas Board, thereupon appealed to this Court.
In discussing the duties, responsibilities and powers of the State Oil and Gas Board of Mississippi, this Court said, in Stack, Jr. et al. v. Harris, 242 So.2d 857 (Miss. 1971):
"The board is an arm of the state empowered by the legislature to prescribe rules and regulations for achieving in practice this policy of the state as announced in Section 1 of the Act and to enforce, maintain and carry out the said policy of the state." 242 So.2d at 860.
Section 1 of the Conservation Act referred to in Stack (Section 6132-01) Mississippi Code 1942 Annotated (Recomp. 1952), declares it to be in the public interests:
"[T]o foster, encourage and promote the development, production and utilization of the natural resources of oil and gas in the state of Mississippi; * * * and to obtain, as soon as practicable, consistent with the prohibition of waste, the full development by progressive drilling of other wells in all producing pools of oil and gas or of all pools which may hereafter be brought into production of such, within the state, until such pool is fully defined."
In defining and enumerating broad and extensive powers of the State Oil and Gas Board, the Mississippi Legislature said:
"(c) The board shall have the authority, and it shall be its duty, to make, after notice and hearing as hereinafter provided, such reasonable rules, regulations and orders as may be necessary from time to time in the proper administration and enforcement of this act, and to amend the same after due notice and hearing, including, but not limited to rules, regulations and orders for the following purposes:
* * * * * *
"(11) To regulate the spacing of wells and to establish drilling units." Miss. Code 1942 Annotated § 6132-10 (Supp. 1970).
We adopt as our own the excellent Opinion and Findings of the Board on the many issues of fact confronting it in this case, which Opinion and Findings are, as follows:
After due and proper notice, and after the docket had been continued for two terms, the matter of the amendment of Statewide Rules 7 and 8 came on for consideration this day.
Various proposals were made to the Board regarding the possible change in such rules. In the main, it was proposed that Statewide Rule 7 governing the spacing of oil wells be amended so as to provide for 80-acre spacing for wells producing from the deeper beds and to change Statewide Rule 8 to provide for spacing of 640 acres for each gas well producing from the deeper beds. A brief historical background of the oil and gas industry of the state insofar as the same relates *769 to the spacing of oil and gas wells is as follows:
The first production of hydrocarbons discovered in the State of Mississippi was in the Amory and Jackson gas fields in the late 1920s, which were of limited significance. The first major discovery was in the year 1939 when the Tinsley Field was discovered, which over the years has been a highly prolific oil field producing primarily from the Selma Chalk and the Eutaw geological formations. In the area of the Tinsley Field these productive formations are encountered at a depth of approximately 4,700-5,500 feet. Subsequent to the discovery of the Tinsley Field, other significant Eutaw fields were discovered, including Heidelberg, Yellow Creek, Eucutta, and Pickens, all of which were productive from what is now considered to be shallow depths.
It then became apparent to the Legislature of the State of Mississippi that it was necessary to enact into law a workable conservation act; and as a result, the 1948 Session of the Legislature enacted the present Conservation Act which over the course of the years has been amended in only minor respects. This Act vested in the State Oil and Gas Board as then created the duty and obligation to promulgate such rules as were necessary for the proper administration of the oil and gas industry within the state and such as would conserve this natural resource.
Pursuant to such authority, in the year 1951 the Oil and Gas Board, after extensive hearings, adopted certain rules, two of which were Rules 7 and 8 which are here under consideration. In the year 1951 almost the whole of the production within the state was at a depth of 6,000 feet or less, the only exception being certain Tuscaloosa production in the southwest portion of the state. At that time the Board, according to some of its critics, arbitrarily set the spacing for oil wells at 40 acres and the spacing for gas wells at 320 acres. The Board then acted upon its best judgment based upon its own experience and the cumulative experience of all of the oil-producing states within the Union. The function of spacing is often misunderstood, the real purpose being to control well density and to prohibit the "bunching" of oil wells which results in waste and inequities. Therefore, the thing of primary importance is well density rather than the amount of surface acreage which is allotted to the production of one well bore, be it either oil or gas.
The spacing pattern of 40 acres for oil wells and 320 acres for gas wells has proved to be an effective spacing for the production of the shallower beds and resulted in a minimum of inequities. Following the adoption of this rule, unknown to many people who are presently interested in the oil and gas industry in the state, the state was the recipient of a rather widespread drilling program which resulted in the discovery of many fields, some of which are still productive and some of which will be productive for many years to come.
In the year 1951, when the present spacing rules were adopted, it was contended that a statewide spacing pattern could not be adopted because of the variations in the characteristics of the many reservoirs and that to do so would not be in protection of the co-equal and correlative rights of the owners in interest. It was also contended at that time that such a pattern was excessive in size.
In the year 1954, in the Soso Field of Jasper, Jones and Smith Counties, Mississippi, the production of oil was obtained from the Lower Cretaceous formation occurring in this field at the approximate depth of 12,000 feet. This discovery set off the second major cycle for the exploration of oil and gas in our state and resulted in the discovery of further productive reservoirs. Many of the reservoirs encountered at such deeper depths proved to be small in areal extent and in many instances having very limited reserves.
*770 The limited reserves so encountered in many instances discouraged the development of such reservoirs because of excessive cost in drilling to and operating the deeper beds. It is at this point that economics became a major factor and of serious concern to those who were willing to invest the risk capital to develop this industry.
The Board was then asked to adopt wider spacing for certain fields, and the Board determined in many instances that the deeper reservoirs could be effectively and efficiently drained with less than one well per 40-acre unit. In almost every instance the deeper beds are under greater pressures and have reservoir characteristics which enable one well to drain an area in excess of 40 acres and a minimum of 80 acres.
In the year 1965 the Bay Springs Field was discovered, being the first field of significant proportions found in the Jurassic geological formations, which includes Cotton Valley, Smackover and Norphlet, all of which formations are now in production within the state. The Cotton Valley reservoir in the Bay Springs Field is productive from an approximate measured depth of 14,500 feet. This discovery again set off a major drilling cycle within the state, being the third such cycle. Most of the wells now being drilled, exclusive of the area of the state in which the Wilcox is productive, are drilled to depths sufficient to encounter the reservoirs above referred to and to depths ranging downward to 20,000 feet. The cost of such wells compared to the cost of wells necessary to penetrate the shallow beds is astronomical, and significant reserves must be encountered to pay the cost of such wells and the resulting operating costs in the event of production.
The Legislature saw fit in the preamble of the 1948 Conservation Act to impose upon the Board the duty of fostering and encouraging the development of oil and gas within the state. The Board, being cognizant of the multiplicity of problems involved in the production of the deeper beds and the cost necessary to produce such beds, is convinced that the same cannot be accomplished on the basis of the spacing rules adopted in the year 1951, when the complexion of the oil and gas industry within the state was totally different from that which now exists.
Because of such problems and pursuant to applications filed with the Board, twelve out of thirteen major discoveries in the Jurassic in the State of Mississippi are now on 80-acre spacing or larger. No application has been filed to date for 80-acre spacing on the remaining field producing from the Jurassic. This fact dictates to the Board the propriety of the development of the Jurassic on spacing greater than 40 acres. It is also significant to note that 80-acre spacing has been so granted almost without protest from either operators, royalty and mineral owners, or others.
Ample evidence was presented to the Board proving that the Jurassic reservoirs within the state can be efficiently and effectively drained on 80-acre spacing for oil wells and 640-acre spacing for gas wells. We do not consider it necessary to here set out such evidence in detail, but the record is amply clear on such evidence being before the Board.
It has been urged upon the Board that the Board cannot set a spacing pattern of 80 acres for oil wells and 640 acres for gas wells which will properly provide spacing for the entire state. We again refer back to the original statewide rules and again note that at the time 40-acre spacing was adopted for the production of oil wells and 320-acre spacing for the production of gas wells, the same contention was advanced.
It has also been urged upon the Board that in certain of the fields in the state producing from the deeper beds the 40-acre spacing pattern must be continued or else a portion of the reservoir would *771 be developed on a 40-acre spacing and a portion thereof on 80-acre spacing. The Board has determined that if such situation exists, the same may be changed by the filing of a petition and application for an exception to the 80-acre rule. The Board has the same authority to make an exception so as to reduce the size of a unit as it does to enlarge the size of a unit.
It has also been urged upon the Board that a permit might be obtained to drill a well to a depth greater than 12,000 feet and that if production is encountered at a lesser depth the spacing of such a well would be 80 acres. The Board also finds this contention to be without merit, inasmuch as the production would have to be from the required depth or below in order for the 80-acre spacing for oil wells to apply or the 640-acre spacing for gas wells to apply.
It has also been urged upon the Board that Section 6132-21 is a regulation by the Legislature as to the size of drilling units. This portion of the existing law was enacted in the year 1956 and provides primarily for the location of wells as exceptions to the prescribed footage limitations and is in no wise a restriction upon the Board regarding the size of drilling units. Section 6132-103 of the Mississippi Code relates to what is commonly referred to as "forced unitization" of oil and gas reservoirs. Again this does not relate in any wise to the authority of the Board to fix the size of drilling units. The adoption of spacing rules by this Board does not in any wise amend such sections but is in furtherance of the obligation imposed by the original 1948 Conservation Act requiring the Board to adopt and promulgate such rules as will provide for the orderly production of oil and gas reservoirs within the state and which will fulfill its obligation to foster and encourage development within the state. The Board further finds that the spacing of 80 acres for oil wells and 640 acres for gas wells to the deeper beds will protect the co-equal and correlative rights of all owners in interest and further foster and encourage the development of the industry within the state.
It has been urged upon the Board to provide for such wider spacing for all wells drilled below a depth of 10,000 feet and to all wells drilled to the Pennsylvanian or older ages. Production from Pennsylvanian and older ages encountered within the state have been to date in only the Black Warrior Basin which is generally located in the northeast portion of the state. Because of the regional dip such formations are encountered at varying depths, becoming shallower in the northern regions of this portion of the state. The Black Warrior Basin is also referred to as the "hard rock" area of the state, and it is extremely difficult and costly to drill a well in this area. Because of these matters and the apparent ability of a productive well to drain a large area, the Board is of the opinion that wider spacing should apply to the Pennsylvanian and older ages where drilled to a depth of 3,500 feet or deeper. The Board is of the opinion that it is not necessary to provide for wider spacing for wells drilled to a subsea depth of 10,000 feet or greater, but is of the opinion that it is in the best interests of the industry, the State of Mississippi and all owners in interest for such wider spacing to apply to depths of 12,000 feet or greater.
The Board therefore finds that Statewide Rules 7 and 8 should be amended in accordance with the findings of this Board as hereinbefore set forth.
We said in Superior Oil Company v. State Oil and Gas Board, 220 So.2d 602 (Miss. 1969):
"Moreover, the Board is not bound to adhere to a strata definition made sixteen years earlier when the facts now reflect new data and different requirements." 220 So.2d at 604.
The standard for a judicial review of the orders of the State Oil and Gas Board has *772 been settled since 1946. In the recent case of Masonite Corporation v. State Oil and Gas Board, 240 So.2d 446 (Miss. 1970) we reiterated, restated and reaffirmed that standard in these words:
"Suffice it to say that the standard in this state for judicial review of the order of the State Oil & Gas Board is well settled. In Superior Oil Co. v. State Oil & Gas Board, 220 So.2d 602 (Miss. 1969), we restated the rule first announced in California Co. v. State Oil & Gas Board, 200 Miss. 824, 27 So.2d 542 (1946), and it is as follows:
"`The standard for judicial review of orders of the State Oil and Gas Board is whether the order is supported by substantial evidence, is arbitrary or capricious, beyond the power of the Board to make, or violates some constitutional right of the complaining party. (200 Miss. at 842, 27 So.2d at 546).'" 240 So.2d at 448.
There is substantial evidence supporting the Orders of the Board in this case, its Orders are not arbitrary or capricious, nor are they beyond the power of the Board to make, nor do they violate any constitutional right of any complaining party. The Circuit Court was in error in reversing the Orders of the State Oil and Gas Board amending Statewide Rules 7 and 8 and in denying and dismissing the Petition of Shell Oil Company et al. to amend Statewide Rules 7 and 8.
The Order of the Circuit Court is reversed and the Orders of the State Oil and Gas Board amending Statewide Rules 7 and 8 are reinstated.
Judgment reversed and orders of the State Oil and Gas Board reinstated.
GILLESPIE, P.J., and RODGERS, JONES, INZER, SMITH and ROBERTSON, JJ., concur.
BRADY and PATTERSON, JJ., dissent.
ETHRIDGE, C.J., took no part.
BRADY, Justice (dissenting):
After hearing oral arguments and after a careful reading of the record and a study of the briefs of counsel, and with due deference to the able opinion concurred in by a majority of my distinguished colleagues, nevertheless we are compelled to dissent. This decision of the Court is probably the most portentious decision which has been made during the tenure of office of each member of the presently constituted Supreme Court. It was especially fitting that the opinion and findings of the Oil and Gas Board which the majority designated as excellent be incorporated in their opinion. For the same reason, it is appropriate that the cogent dissent of Hon. Dan M. Lee, a member of the Board, also be given due consideration. The dissent of Board member Dan M. Lee is as follows:
An extensive hearing was had on March 20 and 21, 1969, relative to the proposed amending of Statewide Rules 7 and 8 of the OIL AND GAS BOARD as promulgated in 1948. Much testimony was heard concerning the economics requiring the spacing to be enlarged from 40 to 80 acres on oil wells and from 320 to 640 acres on gas wells; but, virtually no testimony was offered with reference to the conservation of our mineral resources regulated by this Board. Any person with experience will readily know and realize that economics certainly is a factor which must be considered in every business endeavor and I do not divorce the economies from my thinking in arriving at the conclusions enumerated in hereafter. In considering economics, however, we, as board members, also must consider the duty placed upon us by the legislature in creating the OIL AND GAS BOARD.
The particular sections that I refer to are Sections 6132-10, which provides in part, "The Board shall have the authority and it is to be its duty to make such inquiries as it may think proper to determine whether or not waste, over which it has jurisdiction, exists and is imminent." It is *773 possible that in some fields the Board could carry out its duty, but it is impossible to lay down a blanket rule for 80 acres for oil and 640 acres for gas as it pertains to all of the fields, past, present, and future without knowing the reservoir characteristics. At every board hearing, many operators have filed petitions for exception to special field rules or Statewide Rules and come to this Board for a decision as to whether these rules should be varied from field to field and well to well, based upon the professional testimony of petroleum engineers and geologists as to the particulars and characteristics pertaining to the porosity and permeability, and after hearing such testimony decides whether or not waste is being committed by virtue of the exception sought. To arrive at an overall blanket enlargement of the spacings of wells to produce hydrocarbons without knowing whether or not there will be spotty drainage, or knowing the proper drainage is being attained, is clearly an abdication of the duties and responsibilities of the OIL AND GAS BOARD. It is presumed by some that the changing of the rules to wider spacing would cut down on the work load of the Board as well as for the operating companies. The exact opposite has been accomplished by the adoption of the Amended Rules 7 and 8.
The petition and exhibits thereto attached, filed by Shell Oil Company, proposed the following in part: "With respect to each pool occurring below a subsea depth of 10,000 feet in the discovery well for said pool and from every pool located in the Pennsylvanian or older formations." This language is clear that it was a saving clause as to any existing producing pools and that the proposed rules would not affect any existing producing pools. The Board, in its majority, arbitrarily deleted the language contained in the saving clause of the proposed rules so as to destroy the same and apply the proposed rules to all existing pools, whether newly discovered or presently existing and producing. The effect of this change created a multitude of sins, a few of which are: That many producing pools in the State of Mississippi are not under special field rules and it will be a necessity that either the operators, or the Board of its own action, must immediately set up field rules to protect the co-equal and correlative rights of the operators and the mineral owners. Fields such as Diamond Field and Cypress Creek in Wayne County and Boykin Church in Smith County, have in the same pool 40 acre spacing for existing wells, and under the proposed rules may well have adjacent units of 80 acres, thereby creating an obvious situation where the co-equal and correlative rights of all parties cannot be protected. This would likewise apply as to gas in Gwinville Field and others now so situated.
The Garrett well is drilled on a 320 acre unit (or 40). Petitioner, Shell, has subsequently obtained two 640 acre permits for additional development. The co-equal and correlative rights of the parties under the 320 acre unit will be adversely affected in that, under the Board's authority to regulate production, the 640 acres will be entitled to twice the production attributable to the discovery well and unit, because the Board's authority to allocate production is controlled by statute and is limited to surface acreage. While some of these inequities can be adjusted, many cannot. This Order must stand on its face and be viewed by all as conditions exist as of the time of the entry of the Order and not what the Board, or the legislature, may see fit to do at some future date. This rule is being interpreted by attorneys representing all parties in various sections of this state at this time, and many varied and different opinions have already arisen.
Paragraph one of Rule 7 is in itself ambiguous in that it provides "Every oil well drilled below a measured depth of 12,000 feet and in the Pennsylvanian or older formations below a measured depth of 3,500 feet." An oil well may be drilled to 13,000 feet but will only be capable of producing from a measured depth of less than 12,000 feet. The end result, therefore, is that an operator may drill to a depth of more than *774 12,000 feet measured depth in order to obtain 80 acre spacing and yet produce the well from a much shallower depth. Also, the Pennsylvanian or older formations are found at various depths in the state of Mississippi, so that a well may be on 80 acre spacing for oil and 640 acres for gas in the Pennsylvanian or older formations, even though production is encountered at 1,000 feet. Another interpretation is that it will obviously defeat the protection of the co-equal and correlative rights of all parties by the use of the measured depths rather than subsea depth. For instance we have an existing field where production was encountered and the well drilled to 12,070 feet because it was drilled on a hill, whereas, another operator drilled and encountered production from the same pool with obvious communication, at 11,930 fee. Therefore, one well would be on 80 acre spacing, while the adjoining well, being less than 12,000 feet, would be on 40 acre spacing if they were drilled under the new proposed rules, and therefore could not possibly protect the correlative and co-equal rights of all parties. We know, as a matter of fact, that due to the drilling of Jurassic wells, presently supporting our boom in the industry, that the same situation will be encountered under the proposed blanket rule change.
It is abundantly clear what the legislature intended by adopting Sections 6132-21 and 6132-103 of the Mississippi Code of 1942, which were passed by the 1956 and 1964 legislatures, respectively, that contains the following language viz; "The reasonable minimum amount of productive acreage shall be determined for all purposes as if each oil well drilling unit were a regular governmental quarter-quarter section, comprising of 40 acres, more or less, and as if each gas well drilling unit were a regular governmental one half section, comprising 320 acres, more or less. * * * The wells drilled to determine the boundary of the unit shall be drilled on 40 acre spacing for oil wells and 320 acre spacing for gas wells as provided under the statewide rules."
While we are sitting on this Board in both a legislative and judicial capacity, in this particular hearing, the Board has clearly amended both of these sections by judicial fiat, when the legislature itself refused to grant wider spacing in 1956 and in 1964. I do not believe that we can amend these sections of the code in this way, and further believe that it is an obvious assumption of authority of a bureaucratic board to so attempt. This is the same action that we have complained about the Supreme Court of the United States doing in recent years.
In the same vein, I cannot overlook the fact that this Order is apparently being made effective retroactive to March 21, 1969, and all permits and other privileges granted by the Executive Secretary since that date have been based upon this Order, when in truth and in fact, said Order was not actually entered on the minutes of the Board until April 14, 1969. The writer personally knows that many amendments, particularly that amendment as to the saving clause mentioned hereinabove in this dissent, was not even discussed prior to April 2, 1969. Therefore, the Order is not effective until the date of its entry on the minutes of the Board. This, of necessity, affects the time for appeal because the effective date is March 21, 1969, and it is presumed that the Appeals Section 6134-24, granting 30 days for appeal, would start running as of March 21, 1969, yet the Order was not entered, as provided in Section 6132-15, until April 14, 1969.
It is my considered judgment that if this Order is entered, changing Rules 7 and 8, it will create a chaotic condition whereby it will be impossible for the Board to administer same in a fair and judicious manner. It is my further considered opinion that the Board has created the foundation and basis for a multitude of lawsuits as to the co-equal and correlative rights of operators and mineral owners alike. It is further my judgment that this Order, being legislative in nature, is unconstitutional in that it sets up different drilling depths, *775 obviously discriminating against people in different parts of the state, and therefore is a local and private act rather than a statewide act. It must be fish or fowl, not a little of both.
The legislature has delegated to the Board the authority for the spacing of oil and gas wells based upon investigation and testimony to be heard by the Board. The Board has now abdicated this duty, I think that the legislature has been invited to put the Board in a straitjacket which will seriously jeopardize the oil and gas industry of this state. It is also very significant that no other state has passed such a broad, sweeping, blanket act.
This Board has granted wider spacing on every occasion sought by the operators upon proper showing by expert witnesses as to reservoir and sand characteristics which indicate that maximum drainage will be attained and minimal waste committed by leaving unusual quantities of producible hydro carbons in place never to be recovered. The most efficient recovery results in only approximately 30 to 40 per cent of the hydrocarbons being recovered from the sand sections under 40 acre spacing. The percentage of ultimate recovery under 80 acre spacing will necessarily decrease sharply, and these hydrocarbons will be wasted by being left in place and not economically recoverable at this time.
It is very clear that while I am very much in favor of wider spacing, as indicated by my decisions since being appointed to this Board, I think the Order entered by a majority of this Board does not protect the co-equal and correlative rights of all parties, creates waste of our natural resources, and is unconstitutional. I therefore most respectfully suggest that my learned brethren on this Board are in error, and, accordingly, dissent. (Emphasis added.)
We are in accord with the basic findings and conclusions of this dissent. Thus the differences in interpretation of the facts and law are placed in sharp contrast by the respective opinion and findings of the Board and the dissent. Some of these differences are fundamental and merit serious consideration. Initially, the Mississippi Code 1942 Annotated section 6132-01 (1952) sets forth in clear language the legislative declaration of policy with reference to the natural resources of oil and gas in this state. From this section we learn the legislative intent and the wishes with reference thereto. This section substantially declares that it is in the public interest to foster, encourage and promote the development, production and utilization of the natural resources of oil and gas in the State of Mississippi; to protect the public and private interests against the evils of waste in the production and utilization of oil and gas by prohibiting waste; to safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom; and to obtain as soon as practicable, consistent with the prohibition of waste, the full development by progressive drilling of other wells in all producing pools of oil and gas or of all pools which may hereafter be brought into production of such until such pool is fully defined. It is to be noted that this section provides as follows:
It is not the intent nor the purpose of this law to require or permit the proration or distribution of the production of oil and gas among the fields and pools of Mississippi, on the basis of market demand. It is the intent and purpose of this law to permit each and every oil and gas pool in Mississippi to be produced up to its maximum efficient rate of production, subject to the prohibition of waste as herein defined, and subject further to the enforcement and protection of the co-equal and correlative rights of the owners of a common source of oil and gas, so that each common owner may obtain his just and equitable share of production therefrom. (Emphasis added.)
*776 At the outset, we have the highest regard for the integrity and ability of the members of the Oil and Gas Board but, in spite of this, they still are subject to error.
The State Oil and Gas Board, hereinafter designated as Board, in justification of its opinion and findings and in support of its Amendment to Statewide Rules 7 and 8, urges that the legislature saw fit in its preamble of the 1948 Conservation Act to impose upon the Board the duty of fostering and encouraging the development of oil and gas within the state. Upon inconclusive testimony, the Board concluded that this could not be done under the spacing rules adopted in the year 1951. The Board points out also that the costs of wells which are now being drilled to encounter the reservoirs of oil found in the Jurassic formations are "astronomical" when compared to the cost of wells necessary to penetrate the shallow beds of the Wilcox oil sands. Thus the economic advantage of drilling only one well below 12,000 feet rather than two wells to an 80 acre tract should be and is afforded the major oil companies by the Board in the fond hope that sufficient profits will be derived by the oil producers so that continued exploration and development will take place in this state. To date twelve of the thirteen wells drilled to the Jurassic formation are on 80 acre spacing. Prior to the Board's amendments of Rules 7 and 8 the burden of proving the desirability for the 80 acre spacing was on the oil producer which had the experienced geologists, petroleum engineers, experts and funds necessary to establish the validity of their claim. Twelve out of thirteen times before an objective Board this was done. Under the Uniform Amended Rules 7 and 8 now promulgated the duty and burden of showing, in compliance with the Act, the necessity for requiring a 40 acre spacing is henceforth placed upon the average royalty owner. Assuming that the average landowner and lessor could obtain competent geologists and petroleum engineers, the cost of obtaining their knowledge and services, together with able attorneys, would be prohibitive insofar as the average landowner is concerned. By adopting the statewide rule the Board through its amendments to Rules 7 and 8 disregarded, for economic factors favorable to appellants, the co-equal and correlative rights of the owners of a common source, so that each common owner may obtain his just and equitable share of production.
Appellants, including the Board, frankly urge that because of the cost in drilling into the Jurassic formations they should be allowed a statewide 80 acre spacing and they hasten to add that at this depth one well will efficiently and effectively drain the reservoir. Paradoxically the appellants in their briefs deal largely with the costs per foot for wells drilled between 13,000 feet and 18,000 feet. However, appellants asked the Board for 80 and 640 acre spacing for all wells drilled below 10,000 feet. The Board complied with the request and amended its statewide Rules 7 and 8, widening and increasing the spacing pattern for oil and gas wells drilled below 12,000 feet and in the Pennsylvanian and older formations below a measured depth of 3500 feet, to a drilling unit of 80 acres for an oil well and a drilling unit of 640 acres for a gas well. The cost per foot for drilling from 13,000 feet to 14,000 feet is shown to be $16 per foot; from 15,000 to 16,000 feet, $20.40 per foot; from 16,000 to 17,000 feet, $22.80 per foot; from 17,000 to 18,000 feet, $35 to $52 per foot. On wells less than 10,000 feet the cost was between $8 and $9.50 per foot. This Court takes judicial knowledge that there are hundreds of wells which have been drilled between 10,000 and 10,500 feet on 40 acre spacing that have produced at considerable profit to all concerned over the years and some of which are still producing.
In determining the cost per foot for drilling below 10,000 feet or from 13,000 to 18,000 feet the appellants astutely avoid stating what particular items were included and excluded in computing the overall costs direct or remote and what the costs were except for the year 1968. The record does *777 not reflect how many dry holes were drilled during that year. It does not show the depths of the wells and the productive depths that oil was obtained. It does not reflect the counties and formations where the wells were drilled. It is obvious that the most recent and inflationary costs of 1968 were shown and not a mean or average cost over several years, and covering a majority of the oil producing counties of this state. Shell's able and main witness, John M. McLain, admitted he chose 10,000 feet as the dividing point of increased costs because a larger rig is required. He quickly admitted that if the Board should choose 12,000 feet he would have no objection. He admitted he had not based his conclusions that 80 acre spacing could drain the pool on logs he had studied. He knew nothing of the geological phenomena occurring in the upper Cretaceous formation in the Brookhaven and Mallalieu fields. If this occurred below 15,000 feet in the state and prevented drainage on an 80 acre spacing he pointed out that the royalty owner was not helpless and could petition the Board for 40 acre spacing. We decline to assume that Mississippi's substrata formations are universally uniform, or are equally comparable to Jurassic formations in North Dakota, Kansas or New Mexico. It is apparent that the carte blanche assertions as to per foot drilling costs of the appellant are of dubious probative value, and should have been so considered by the Oil and Gas Board instead of valid proof of astronomical increase in costs. This is particularly true because the realized income per foot appellants declined to reveal. Shell's sole witness, Mr. McLain, knew nothing about redrills in the Brookhaven and Mallalieu fields which are spaced on the 40 acre basis. Furthermore, witness McLain admitted his information was obtained from studies based on information published in the oil and gas bulletins of the State of Mississippi. He stated that his drainage conclusions as to the 80 acre spacing were by "analogue." To assume by analogy, as did witness McLain, who said, "By analogy, as to the Jurassic fields that we would encounter in the future, you would expect them to have the same characteristics as you have found in the past, that is, porosity from 11% to 19% and permeability of sufficient magnitude to insure 80-acre drainage," is a far cry from proof that such will be the case in any one county, much less over the entire state.
It is obvious that oil companies exploit oil fields to make profits and not primarily to produce the maximum oil. This is precisely why the 80 acre and the 640 acre spacing was sought and obtained. The profit motive is neither good nor evil per se. Like fire, when controlled and wisely used it is a benevolent servant, but when uncontrolled and unjustly exercised it is a destructive, dreadful tyrant.
Many a landowner will never realize the oil he would have obtained had the 40 acre and 320 acre spacing remained. The major oil companies would not have received the profits which possibly now they can double. Now, many a landowner or royalty owner may never during his lifetime receive any monetary benefits from oil or gas which he would have received, but the oil companies will do so as long as there is any oil to be profitably captured. In this regard the order of the Board is arbitrary in that it does not protect the co-equal and correlated rights of all owners in interest, though it probably fosters and encourages the development of the oil industry in the state.
Just as Job greatly feared the pestilence which came upon him, so did the Board anticipate or fear the just criticism which would be made of their arbitrary and capricious allowance of the 80 and 640 acre spacing. Realizing that here was the heel of Achilles in their opinion, and anticipating the criticism which properly must be directed toward their opinion, namely, that it is arbitrary and capricious, the Board stated:
In the year 1951, when the present spacing rules were adopted, it was contended that a statewide spacing pattern *778 could not be adopted because of the variations in the characteristics of the many reservoirs and that to do so would not be in protection of the co-equal and correlative rights of the owners in interest. It was also contended at that time that such a pattern was excessive in size.
The logical assumption from this statement is that since the arbitrary 40 acre spacing adopted in 1951, when the Board had practically no information whatever, which required twice the number of wells now required under the 80 acre spacing, was very productive and beneficial to the leaseholders as well as the oil producers, just so the 80 acre spacing, mirabile dictu, will likewise be equally beneficial. Of course, such a conclusion cannot rationally be assumed, particularly under the proof offered in this case. We contend that the 12,000 feet depth is an arbitrary, unreasonable and capricious depth for the reason that there is no showing that the subsurface and substrata formations and pools of the State of Mississippi are uniform, or are comparable to those in North Dakota and Kansas. To the contrary, it is common knowledge that there are Lazarian gulfs of difference between the thickness of the pools, chalk, shale, hardrock or granite substrata foundations which exist and vary in the eighty-two counties of this state.
This is also true of variable geological phenomena, degrees of porosity, permeability variations, differences in oil viscosity and divergent reservoir rock characteristics. To drill from some of the former or present existing wells a well 1600 feet deeper to a total depth of 12,000 feet as they exist in the Brookhaven and Mallalieu Fields would certainly cost a great deal less to the producer than it would to do so in the Black Warrior Basin or to the Cotton Valley, Smackover or Norphlet Foundations in other counties of this state. To conclude that the cost of drilling a well 12,000 feet in any of the eighty-two counties of this state would be uniform appears to us to be the height of analogous wishful thinking.
Appellants, in defense of the widening and increasing the spacing pattern for oil and gas wells by the amendments to Rules 7 and 8, urge that under the original statewide rules it was then also contended by the landowners that the 40 and 320 acre spacing would not properly provide spacing for the entire area. There is a vast gulf of difference in drilling into an oil pool with two wells to 80 acres and with one well on 80 acres, and we feel safe in concluding that the credible proof in this cause is conclusive that two oil wells on 80 acres of land will deliver more oil from the pool to the surface and be of more benefit to the royalty owner than will one well. The volume of oil which has been recovered in Mississippi on a 40 acre spacing and the gas on 320 acre spacing since 1951 is proof conclusive of this fact. There is far more chance for waste of natural resources with one well than with two to 80 acre spacing in an oil pool 12,000 feet in depth.
The Board further finds that the spacing of 80 acres for oil wells and 640 acres for gas wells for the deeper beds will protect the co-equal and correlative rights of all owners in interest and further foster and encourage the development of the industry within the state. Just how it protects the co-equal and correlative rights of all owners in interest except by analogy is not shown. It is obvious, however, that it should foster and encourage the continued drilling of wells by the oil industry within the state on an 80 acre oil and 640 acre gas spacing.
We do not question the rule of law set out in Stack v. Harris, 242 So.2d 857 (Miss. 1971), which authorizes the Board to prescribe rules and regulations for achieving in practice the policy of the state as announced in Section 1 of the Act. But we do seriously question that the new adopted Rules 7 and 8 regarding spacing will achieve or will tend to achieve *779 the just and equitable policy announced by the legislature.
We do not take issue with the rule of law as announced in Superior Oil Company v. State Oil & Gas Board, 220 So.2d 602 (Miss. 1969) for the reason that it does not materially affect the basic issue in this cause.
We do endorse the fundamental rule announced in Masonite Corporation v. State Oil & Gas Board, 240 So.2d 446 (Miss. 1970) because in that case this Court clearly stated that:
"The standard for judicial review or orders of the State Oil and Gas Board is whether the order is supported by substantial evidence, is arbitrary or capricious, beyond the power of the Board to make, or violates some constitutional right of the complaining party. (200 Miss. at 842, 27 So.2d at 546)." (240 So.2d at 448.) (Emphasis added.)
This rule of law stands in protection of the state and the rights of royalty owners from findings by the Board that are predicated upon analogy and not facts, upon beliefs and not seismographic recordings, upon suppositions and not upon cored and analyzed substrata formations, proven viscosity, permeability, porosity, other established variable geological phenomena and actual oil reservoirs.
Therefore, we hold that the finding of the Board is not supported by substantial evidence but is based upon analogous deductions and conclusions and is arbitrary and capricious. In the case of Central Electric Power Association v. Hicks, 236 Miss. 378, 110 So.2d 351 (1959) we defined what substantial evidence is and said it "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." Under this definition the evidence offered by appellants, in our opinion, does not afford a substantial basis of fact from which the fact in issue relating to the 80 acre and the 640 acre increased spacing of oil and gas wells can be reasonably inferred.
The disinterested, objective, factual and forceful testimony of Dr. Oscar Paulsen, Associate Professor in the Department of Geology of the University of Southern Mississippi, and of Mr. Frederick F. Mellen, Consultant in Geology with thirty-five years experience in petroleum production, who discovered the Tinsley structure in this state, constituted what is meant by substantial evidence. They denied that the enlarged spacing would produce more oil or conserve more, and gave logical facts in support thereof and relied not on "analogue." Their testimony is far more credulous. The findings of the Board do not permit, on an 80 acre and 640 acre statewide spacing, the owner or owners in a common pool or source of supply of oil and gas to obtain their just and equitable share of production as set out in the preamble of the Act, because there will be left in the ground various quantities of oil which cannot be recovered or will not be as profitable for the producers to recover from the pools which would have been recovered under a 40 acre and 320 acre spacing. To such extent the royalty owner is being deprived of his property without due compensation.
We fail to find any provision in the Act which requires the Board to provide that a producer should be assured, if possible, even a two to one return on the money investment so that one 15,000 foot oil well should produce 600,000 barrels of oil and most certainly not a three to one return so that a 12,000 foot oil well will return 420,000 barrels or a 15,000 foot well must produce 820,000 barrels of oil in order to maintain a three to one return which is seriously urged as its right by appellants through their witness Ford. A just and equitable share of production for royalty owners certainly cannot be considered on any such production concept which the *780 Board must have felt would offset the "astronomical" rise in production costs.
The State of Texas has produced and produces more oil than all the other states of this nation. The great oil producers, corporate and otherwise, constitute the greatest power structure that state has ever known and yet the oil producers have never succeeded in obtaining in Texas the statewide 80 and 640 acre spacing which is soon to be so beneficial to the royalty owners and producers of Mississippi. It is strange indeed if it is of such beneficence to Mississippi why it hasn't been in operation on a statewide basis in Texas, lo these many years, and in some of the other southern states. If the statewide spacings as amended are so beneficial to the producers and royalty owners and are in operation in Texas and the other southern states, certainly the appellants would have paraded these facts before us with metronomic regularity throughout the record which is strangely silent with reference thereto.
In conclusion, there are two matters of which we can be sure and they are, first, that the next spacing rules which will be urged and sought, which is inferrable from the record, for the same identical economic reasons which now have been urged, will be in lieu of 80 acres for oil and 640 acres for gas statewide; we will have 160 acres for oil spacing and 1280 acres for gas spacing urged for all wells drilled below 16,000 feet statewide. Thereafter possibly for all oil wells of 20,000 feet in depth or below a spacing of 1280 acres for oil wells and a spacing of 2560 acres for gas wells will be urged, and both for the same economic reasons. The second certainty, which has no direct bearing on the merits of the cause but perhaps is worthy of consideration, is as follows: The utilities of communication, power, heat and transportation, the labor generating manufacturing and industrial organizations are of us, for us, and with us, and will remain so, but when the last barrel of oil has been profitably drained from under Mississippi the transient major oil producers will "fold their tents like the Arabs and silently steal away," but the taxpaying landowners who have been here for generations and the ex-royalty holders of Mississippi still will be here. The Board's statewide, arbitrary increased spacing should hasten that day.
Perhaps as indicative of the autocratic attitude or action of the Board is the fact that their order apparently was made effective retroactively to March 21, 1969, when the order was not actually entered on the minutes of the Board until April 14, 1969, and amendments including the saving clause mentioned in the dissent of Hon. Dan M. Lee were not even discussed prior to April 2, 1969.
Although the legislature of Mississippi had twice declined by statute to enlarge the spacings, the Board did not hesitate by judicial fiat to grant substantially the appellants' demands. A just and equitable share of production and co-equal and correlative rights of owners in a pool of oil still can be protected by the legislature of this state just as they are in other states.
We hold that the order of the Board is arbitrary and capricious and denies the royalty owner a just and equitable share of production for economic reasons not contemplated or authorized by the legislature. The judgment of the circuit court should be affirmed.
PATTERSON, J., joins in this dissent.
PATTERSON, Justice (dissenting):
I concur in the dissent of Justice BRADY. I trust the following additional comments in dissent are not inappropriate.
The naivete of the majority is apparent in that it reverses the circuit court and adopts in toto the opinion of the Oil and Gas Board without reaching the true issue of the suit.
The resume of oil and gas production in Mississippi which is set forth in the *781 board's order is appropriate and our state is fortunate in having natural resources in the form of oil and gas which attracts those in the industry to our area. The welcoming arm of an economically poor state to the oil industry is of course commendable. I doubt, however, that the hospitable arm is the moving factor in attracting the industry to the petroleum producing areas of the state. The resources of the oil and gas sub-surface strata and the possibility of profit by their extraction are the compelling attractions. The oil and gas industry is a business primarily concerned with making a profit just as other businesses are so concerned. It differs, however, in that it affects directly, in addition to the indirect benefit from taxes that all citizens receive, many, many royalty owners throughout the state. The direct interest of the individual royalty owner, in most instances the landowner, is ordinarily expressed through the medium of an oil and gas lease, one of the major provisions of which is the payment of one-eighth royalty (the norm) to the owner in the event of production. These lease contracts are subject to the legislative policies of the state for the conservation of its natural resources. The policies of the state prohibiting the evils of waste are enforced by the Oil and Gas Board. Its duties and responsibilities in this regard are difficult and much expertise is acquired by its members in the performance of these functions. It is for this reason that this Court and others limit reversals of opinions from expert boards to those instances in which the Court concludes that the board's action is not supported by substantial evidence, is arbitrary or capricious, beyond the power of the board to make, or violates some constitutional right of the complaining party. Masonite Corp. v. State Oil & Gas Board, 240 So.2d 446 (Miss. 1970).
One of the difficulties encountered by the board with regard to spacing acreage of drilling units is brought about by the conflict of interest which inevitably emerges from the competitive positions of the royalty interest and operating interest. These interests, in spite of the implied duty upon the operating interest, the lessee or his assigns, to do that which is in the best interest of both himself and the royalty owner, the lessor landowner or his assigns, often become antagonistic due to production practices thought necessary to the operator's profit. It is further complicated by the conservation policies of the state necessary for the prevention of waste. It is necessary, I think, that these three interests, with their likelihood of conflict, be kept in mind in determining whether the board's order which increased spacing for drilling units from 40 to 80 acres for oil and from 320 acres to 640 acres for gas thus reducing the royalty owner's anticipated income from oil or gas runs by fifty percent, at least until an allowable is set, and thereafter if the maximum efficient rate of production prohibits an increased allowable, is arbitrary, capricious, beyond the board's power or unconstitutional.
It is necessary in order to carry out the legislative intent, accomplish justice between the parties litigant, and preserve a workable formula on spacing necessary for the prevention of waste to look beyond the gloss of the board's opinion to the realities of the situation as reflected by the appropriate statutes and the evidence.
Mississippi Code 1942 Annotated section 6132-01 (1952), a declaration of policy, provides:
It is hereby declared to be in the public interests to foster, encourage and promote the development, production and utilization of the natural resources of oil and gas in the state of Mississippi; and to protect the public and private interests against the evils of waste in the production and utilization of oil and gas, by prohibiting waste as herein defined; to safeguard, protect and enforce the co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of *782 supply of oil and gas may obtain his just and equitable share of production therefrom; and to obtain, as soon as practicable, consistent with the prohibition of waste, the full development by progressive drilling of other wells in all producing pools of oil and gas or of all pools which may hereafter be brought into production of such, within the state, until such pool is fully defined.
It is not the intent nor the purpose of this law to require or permit the proration or distribution of the production of oil and gas among the fields and pools of Mississippi, on the basis of market demand. It is the intent and purpose of this law to permit each and every oil and gas pool in Mississippi to be produced up to its maximum efficient rate of production, subject to the prohibition of waste, as herein defined, and subject further to the enforcement and protection of the co-equal and correlative rights of the owners of a common source of oil and gas, so that each common owner may obtain his just and equitable share of production therefrom. (Emphasis added).
Section 6132-08, subsection (k) "Definitions" states, in applicable part, as follows:
(k) "Waste" shall mean and include the following:
(1) The inefficient, excessive, or improper use or dissipation of reservoir energy; and the locating, spacing, drilling, equipping, operating or producing of any oil or gas well or wells in a manner which results or tends to result in reducing the quantity of oil or gas ultimately to be recovered from any pool in this state.
Section 6132-10 enumerates the powers of the State Oil and Gas Board as:
(a) The board shall have jurisdiction and authority over all persons and property necessary to administer and enforce effectively the provisions of this act and all other acts relating to the conservation of oil and gas.

(b) The board shall have the authority, and it shall be its duties to make such inquiries as it may think proper to determine whether or not waste, over which it has jurisdiction, exists or is imminent. In the exercise of such power, the board shall have the authority to collect data; * * *.
(c) The board shall have the authority, and it shall be its duty, to make, after notice and hearing as hereinafter provided, such reasonable rules, * * * as may be necessary * * * in the proper administration and enforcement of this act, * * * for the following purposes: * * *. (Emphasis added).
One of the purposes enumerated and appropriate to this litigation is Subsection (11) as follows: "To regulate the spacing of wells and to establish drilling units."
Section 6132-109 (Supp. 1970), restricts the administration of the act by the Oil and Gas Board to the declaration of policy announced in Section 6132-01, supra. The predominant legislative theme is the conservation of the state's natural resources. Conservation, the prevention of the evils of waste, affords the right of the state through its police power to enter into what would otherwise be of private business concern. See Masonite Corp. v. State Oil & Gas Board, 240 So.2d 446 (Miss. 1970), and Superior Oil Co. v. Foote, 214 Miss. 857, 59 So.2d 85 (1952), wherein we stated:
Hence the courts have consistently held that the state may enact regulatory laws for and prescribed methods of extracting oil and gas for the purposes of conservation, the efficient utilization of reservoir energy, and the protection of the correlative rights of all owners in a common source of supply. (214 Miss. at 875, 876, 59 So.2d at 93).
The opening remarks of the attorneys for the petitioners indicate quite clearly *783 that the primary purpose of the petition was one of economics for their clients which they propose to change for the better by the route afforded through the conservation laws of the state. A fair review of the evidence adduced by them in support of this position was that the economics of the petroleum industry require larger spacing as the result of increased drilling costs below 10,000 feet. Their evidence was that one well could efficiently drain 80 acres of oil below 10,000 feet due to the mobility of the oil at that depth and the nature of the strata encountered, and that one gas well could efficiently drain 640 acres due to its mobile nature and the permeability of the strata. The premise of efficient drainage being established, evidence was then introduced to demonstrate that the drilling costs saved by drilling one well on each 80 acres where the producing strata was below 10,000 feet rather than one well to each 40 acres would be of great economic advantage to the operators, would foster and encourage drilling, and would permit the state to remain competitive with other states for favorable allocation of the industry's exploration dollars.
The evidence relating to the "hard rock" Black Warrior Basin which is composed of Tishomingo, Itawamba, Monroe, Lowndes, Noxubee, Kemper, Neshoba, Winston, Oktibbeha, Union, Tippah, Benton, Pontotoc, Lee and Clay Counties is one of hardship to the industry due to difficult and expensive drilling conditions. At the time of the hearing there were two gas wells in the area and another being tested. From the geological information gained therefrom, together with that gleaned from several dry holes, the difficulty of drilling, plus the refusal of the Federal Power Commission to raise gas rates, the opinion was expressed by petitioners' witnesses that from an economic viewpoint enlarged spacing for drilling operations below 3500 feet was required to encourage drilling in the area. Again there was evidence that the enlarged areas could be efficiently drained by a single well.
The evidence of the operating interests, petitioners, with reference to waste may be summed up in the words of one of their witnesses:
Ignoring economics and speaking only of conservation, I can see that if we do not have wider spacing in some of these deeper fields, oil will be left in the ground because you simply will not find people that will drill them.
However, it was developed by the objectors that the Oil and Gas Board had been very fair in granting exceptions to the regulations now in effect. In fact, on twelve out of thirteen occasions when petitioned by Shell, and upon evidence introduced by it, the board had enlarged drilling units from 40 to 80 acres. The petitioners admitted the board had been most generous with them, but they proclaimed that the present procedure involves delay, from 45 to 60 days, is burdensome and results in inequities to them. The inequities were expressed as:
A period of time between the drilling of the first one or two wells is sufficient enough; the royalty owners are paid on forty-acre basis, and then later they are paid on eighty-acre basis.
This statement, as construed by the chairman of the board, means that there is no authority for the board to direct the operator to pay the royalty owner retroactively on an 80-acre basis, a fifty percent reduction, rather than a 40-acre royalty basis from initial production until the granting of the exception. The subsequent evidence reveals that it was the petitioners' opinion that this inequity would be removed by enlarging the spacing of drilling units to 80 and 640 acres on a statewide basis. The benefits enumerated were that it would eliminate the burden of introducing evidence to obtain an exception from the present rule and would also have the effect of avoiding the time *784 delay requisite for notice to the owners required by present procedure. These witnesses acknowledged that at times this could impose injustice upon the royalty owners, but rationalized that the encouragement to the industry would result in more rapid development of the fields and that in any event a petition for an exception to decrease the unit size, if the rule were modified, could be filed to relieve the hardship.
The evidence of the independent witnesses offered by the objectors to enlarged spacing on a statewide basis was that the increase was not needed due to the complexity and independent characteristics of the subsurface reservoirs and strata, many of which are complicated by complex faulting. It was their opinion that the lenticularity of the deep subsurface strata, the shallowness of the pay sand at times, and the faulting would result in inefficient drainage by the larger units when compared with the present and would leave a greater residual of oil and gas within the strata at the time production ceased. These witnesses did testify, however, that at times the enlarged spacing was warranted, but thought that this should be a matter for the board to decide upon petitions for exceptions rather than the adoption of a statewide rule on an administrative basis.
They concurred with the petitioners' witnesses that the economic climate for oil activities in the state is good and that drilling is under away under the present regulations. They also testified that the operators were making a profit though they did not know the percentage thereof. The petitioners' witnesses admitted their Mississippi operations were profitable, but refused to reveal the percentage of profit though they did concede that oil and gas leases in the areas favorable to deep exploration were the objects of much competition for purchase.
From this evidence the board discarded the 40 and 320 acreage spacing requirements for drilling units by doubling the acreage requirement. The board's opinion is quoted in full by the majority, hence broad comment is not necessary to it, it being sufficient to point out that by its terms it is based upon the board's duty to prevent "bunching" of wells which results in waste and inequity and its duty to foster and encourage the development of oil and gas within the state. The board's reference to "bunching" of wells overlooks the fact that there was no issue before it that one oil well to each 40 acres constituted "bunching" or contributed to waste. It would seem, therefore, that this statement would lend little strength to the validity of its order. Though reference is made to the co-equal and correlative rights of the owners, nothing is stated with specificity as to how their rights are safeguarded except the conclusion that the fears expressed in 1951 by objectors to the adoption of spacing regulations then being considered failed to mature and hence by inference would fail to mature again and that the encouragement to the industry would offset any loss of co-equal and correlative rights of the owners. It seems to me again that these general conclusions lend little strength to the order of the board and in fact expose its basic weakness, the lack of evidence appertaining to waste to support it. It is for these reasons that I am of the opinion that this Court erred in vacating the order of the Circuit Court of Pearl River County and reinstating the order of the board.
The true issue before the Court is whether the vested property interests of the royalty owners which have sprung up in reliance on the established rules of this state since 1951, 40 and 320-acre spacing, may be swept away by an administrative order based upon slight and tenuous evidence not related to the waste of oil and gas. The magnitude of the edict is of some significance, I think, since there are approximately 47,716 square miles within the state, many of whose areas are untested for oil or gas and literally thousands of oil and gas leases of tremendous value executed under the 1951 standard which are directly affected by the order.
*785 At the outset I doubt that it is possible to protect the co-equal and correlative rights of the owners[1] and royalty owners without an understanding of their contractual relationship to each other. The "reasonable and prudent operator rule" has been adopted by this state. Monsanto Chemical Co. v. Sykes, 245 Miss. 207, 147 So.2d 290 (1962), and Monsanto Chemical Co. v. Andreae, 245 Miss. 11, 147 So.2d 116 (1962). This rule brought with it the implied covenants established by the courts since the initial case of Stoddard v. Emery, 128 Pa. 436, 18 A. 339 (1889), which were necessary to protect the lessor (royalty and mineral owner) from hardship under the lease contracts. The difficulties arose from the fact that the lessee (operating interests) had the exclusive right to the premises for oil and gas exploration and production and hence the exclusive knowledge of the subsurface capabilities revealed by testing and exploration. This fact, when linked with the inability of the scriveners of lease contracts to express in present terms that which could only be determined by knowledge gained from subsequent drilling and analysis gave birth to the implied covenants. They are in essence the application of an old principle of American law, dating at least from 1837, that whenever a relationship exists between two parties in which compensation to one depends upon the diligence of the other, the law implies a duty on the latter to be diligent. See Merrill, Covenants Implied in Oil and Gas Leases, §§ 218, 221 (2d Ed. 1940).
The sum of these implied covenants is that the lessee shall do that which is for the best interest of both himself and the lessor so that each might receive just distribution of the products of the well. They are so inextricably imbedded in the laws appertaining to oil and gas by the case law and the passage of time that they cannot be overlooked in a proceeding which involves the co-equal and correlative rights of the owners, and this is particularly true when it is realized that these covenants are voluntarily accepted by the operating interests when they purchase oil and gas leases, the basic instruments upon which the petroleum industry is founded. The implied covenants to protect from drainage, of reasonable development, further exploration, and to market the product imposed upon the lessee have received additional strength in this state by Millette v. Phillips Petroleum Co., 209 Miss. 687, 702, 48 So.2d 344, 347 (1950), and Phillips Petroleum Co. v. Millette, 221 Miss. 1, 14, 72 So.2d 176, 178 (1954), wherein we acknowledged the existence of another implied covenant sufficient to override an expressed agreement:
The equitable duty, existing as well under implication, to conserve the mineral resources of lessors or to refrain from depletory acts survives unimpaired. * * *
Perhaps the more specific issue is whether the vested rights of the landowner, protected by the constitution, the statute laws and by implied covenants can be destroyed by a petition praying for an innocuous rule change.
The petitioner alleged that it was disadvantaged by the present rules. The disadvantage is explained in the evidence as resulting from the payment of royalty on a 40-acre basis pending the 45 to 60 days delay necessary to obtain an exception from the 40-acre rule. The exception, if granted by the board, enlarging the unit to 80 acres, would reduce the royalty by one-half. The inequity complained of is that there is no authority in the board to reduce retroactively the interim royalty payments to the exception basis. I am convinced this is not a disadvantage or an inequity imposed upon the petitioner. The hypothesis projected by the petitioner to obtain an exception from *786 the present regulation assumes the existence of an oil and gas lease on a minimum of 80 acres and that oil has been discovered on one of the 40's thereto in paying quanties. It next assumes, as it must, that this well would efficiently drain the 80 acres. This assumption gives rise to another, again as it must, that the 40 acres sought by the exception to be combined with that upon which the well is located would also produce in paying quantities, i.e., oil recovery in excess of drilling costs. If this were not so, an exception would be unnecessary since the petitioner would be relieved under the "prudent operator rule" of drilling the well if the likelihood of oil recovery was thought to be less than the drilling cost. Monsanto Chemical Co. v. Andreae, 245 Miss. 11, 147 So.2d 116 (1962).
The petitioner's hypothesis, if found to be persuasive so that the board grants an exception, has the immediate effect of relieving the petitioner of the implied covenant of further development, saving it the tremendous cost of drilling a well. The drilling cost saved is obviously greatly in excess of the royalty payment made during the time interval necessary to obtain the exception. The alleged disadvantage is in fact a financial advantage of some significance which evidently was not considered by the board or the majority of the Court since it was not mentioned in the order or opinion.
In considering the remaining disadvantage advanced by the petitioner, delay occasioned by notice and hearing to obtain an exception, it is noteworthy that the disadvantage is not resolved by the board's order, but rather is shifted to the royalty owner. Clairvoyance is not needed to predict that the financial interests of the operators will not be enhanced by reducing spacing requirements and that henceforth the responsibility will rest upon the royalty owner. He is thus saddled with the disadvantage alleged to be burdensome to the industry. The disadvantage is not alleviated by shifting the burden of proof, but rather is compounded since it is placed upon the backs of those who are least able, through lack of knowledge and finances, to come forth with competent proof to protect their property rights by way of exception.
The knowledge revealed by drilling and exploration belongs exclusively to the operating interests and is not readily available to the royalty owner. The knowledge exclusive to the operating interests affords such an advantage to them that many authorities now believe that an implied duty rests upon these interests to represent the royalty and mineral interests before the oil and gas regulatory agencies of the various states for the precise reason that they are better equipped to do so by virtue of the very knowledge that is here shifted to the one least able to carry it. 5 Williams & Meyers Oil & Gas Law, Implied Covenants [Other Implied Covenants] § 804 (1969); Merrill, Covenants Implied in Oil & Gas Leases §§ 228, 861.4 (2d Ed. 1940, 1959 Supp.); and 9 Okla.L.Rev. 125 (1956). The cost of geological witnesses and the studies necessary to obtain knowledge equivalent to that of the lessee necessary to the success of the petition is substantial and would from a practical viewpoint effectively close the door of the Oil and Gas Board to the royalty owner.
I am of the opinion that the order of the board which is based upon the above premises and not upon evidence of waste is arbitrary and capricious. The correlative and co-equal rights of the royalty owners were inundated by the evidence directed to the economic interests of the petitioners who seek increased profit over what appears to be good profit as an incentive to the industry. The language of the Supreme Court of Oklahoma in re the Application of Peppers Refining Company, 272 P.2d 416, 424 (Okl. 1954), though limited to a single reservoir, not statewide as here, answered a similar argument most precisely as follows:
In our opinion it is more important to secure to each lessor, lessee, and owner *787 of mineral rights in a field, his ratable share of the production therefrom and to prevent underground waste, than it is to secure to some, the maximum profits from drilling and producing operations. * * *
See also 7 Oil & Gas Rep. 1471 (1957), as well as 5 Oil & Gas Rep. 1219 (1956), Application of Champlin Refining Co., 296 P.2d 176 (Okl. 1956), and 3 Oil & Gas Rep. 1385 (1954).
Moreover, the legislature has limited the jurisdiction of the board to the determination of whether waste exists or is imminent. Miss.Code 1942 Ann. § 6132-10(b) (1952), supra. Indeed, the definition of waste [Mississippi Code 1942 Annotated section 6132-08, subsection (k) (1952)] refers to the inefficient, exclusive or improper use or dissipation of reservoir energy, etc., "which results or tends to result in reducing the quantity of oil or gas ultimately to be recovered from any pool in the state." Nowhere does the legislature refer to economic waste. The economics of the oil industry must of course be considered in arriving at the proper size of drilling units. Of first importance, however, is the condition of the reservoir or subsurface strata. The permeability of the reservoir rock and the viscosity of the oil will have an important bearing on how large an area one well will drill. These conditions also are of first importance in considering the maximum efficient rate of production so that waste will not occur. The legislature undoubtedly considered the facts of life of the oil industry, that operators usually favor wide spacing in order to minimize development costs and that landowners can be counted on to seek close spacing for a quick return, in enacting the conservation laws based upon physical waste of oil and gas. It has on at least two occasions since the adoption of the present rule on spacing in 1951 refused to enlarge the drilling units and as recently as 1970 [Mississippi Code 1942 Annotated section 6132-21 (Supp. 1970)] has expressed the familiar rule of 40 and 320 acres as the standard of measurement to be used in allocating the benefits from productive acreage. It is my opinion that the legislature did not intend, though its intent was expressed in a negative fashion, for the Oil and Gas Board to do that which it had refused to do, inasmuch as it quite carefully limited the board's power to the prevention of the evils of waste. I am, therefore, of the opinion the board acted beyond its power and in derogation of the legislature in adopting a statewide administrative order thereby superseding the vested property interests of so many over such a vast area, much of which remains virtually unexplored, for the production of oil or gas.
It is my further opinion that the board erred in not giving consideration to the time of production. It is common knowledge that most operating interests are corporate and that most royalty owners are individuals. The time element obviously weighs more heavily upon the individual than it does the corporation. Neither is the sole judge of the rate of production, the test being what would be expected of an ordinary prudent operator. See Temple v. Continental Oil Company, 182 Kan. 213, 320 P.2d 1039, 1056 (1958), wherein the Court stated:
There was a period in the history of the oil industry when virtually no limitation existed on the number of wells that could be drilled on a given lease. Conservation measures and state control have altered this practice to prevent waste. The present facts and circumstances presented to this court indicate the swing in reverse  eventually the plaintiffs will receive all the royalty payments to which they are entitled. This is not the development of an oil and gas lease contemplated by prudent development of the tract. * * *
See also Temple v. Continental Oil Company, 183 Kan. 471, 328 P.2d 358, 360 (1958), for a discussion of the time element as it relates to production:
* * * Proof by appellants disclosed that eventually all the recoverable oil *788 from the 10-acre tract in question would be produced by existing wells on the Gibson lease.
It is at this point that the time element must be reconciled with the established Prudent Operator Rule. It is well settled that where the existence of oil in paying quantities is made apparent, it is the duty of the lessee to continue the development of the property and to put down as many wells as may be reasonably necessary to deplete the oil and gas reserves underlying the premises for the common advantage of both the lessor and the lessee. Obviously, fulfillment of this obligation might require the drilling of several wells, despite the fact that one well alone might ultimately drain the entire reservoir given unlimited time. In other words, lessees cannot prove compliance with the Prudent Operator Rule by showing they have drilled enough wells to "adequately" drain the recoverable oil from the leased premises "eventually". Here the requirement to "adequately drain" is conditioned by appellants on the time element  given sufficient time the wells will eventually drain the recoverable oil adequately. Such ambiguity in defense, once the lessors have sustained their burden of proof in accordance with the established law, is equivalent to no defense. Appellants, having thrust the time element into a defense under the Prudent Operator Rule, cannot now be heard to say this court is making a departure from the Rule by inserting a time element into the implied covenant to develop an oil and gas lease. The term "Prudent", with reference to an Operator of an oil and gas lease, is sufficiently broad to ensnare any ingenious device or scheme conceived to circumvent the plain meaning of the Prudent Operator Rule.
For brevity this point is not discussed further other than to repeat it was not considered by the board even though it is obvious that one well to each 40 acres will produce virtually twice the amount as one well to each 80 acres for a specified interval of time.
I believe the foregoing is sufficient to affirm the order of the circuit court and that the constitutional issue emanating from the delegation of legislative powers to the Oil and Gas Board without specifying with reasonable clarity the boundaries of the delegated powers need not be reached in this dissent. Broadhead v. Monaghan, 238 Miss. 239, 117 So.2d 881 (1960), and State v. Allstate Ins. Co., 231 Miss. 869, 97 So.2d 372 (1957). The conservation laws have been declared constitutional over-all; however, the question remains in a limited sense as to whether the terms expressed in Mississippi Code 1942 Annotated section 6132-10, subsection (11) (1952), "to regulate the spacing of wells and to establish drilling units" without limitation other than that in Section 6132-01. "It is hereby declared to be in the public interests to foster, encourage and promote the development, production and utilization of the natural resources of oil and gas in the state * * *." and upon which the board leaned so heavily, is so vague and indefinite that no limitation in fact exists. The question is serious and ultimately will have to be decided by the courts unless the legislature in its wisdom shall think it proper to designate a reasonable standard.
In conclusion it seems to the writer that the welcome which the state extends to industry through the policies pronounced by the legislature is wholesome and projects the proper image for a state noted for its hospitality, but the zeal in putting into practice the enactments should never encroach upon the vested rights of the citizenry. When it does so, as here, its order, in my humble opinion, is arbitrary and beyond the power of the board. The illness just does not warrant the drastic cure.
For this and the above reasons, I dissent from the majority.
*789 BRADY, J., concurs.

ON PETITION FOR REHEARING
Rehearing denied.
SUGG, Justice (dissenting):
I am compelled to dissent, first, because I am of the opinion that the State Oil and Gas Board exceeded its legislative authority when it passed the Statewide Rules and Regulations pertaining to the spacing of oil and gas wells.
By Chapter 256, Laws of 1948 the Legislature created the State Oil and Gas Board to prevent waste as defined in paragraph 4 of the act, and to foster, encourage and promote the development and utilization of the natural resources of oil and gas in the State of Mississippi.
Under section 4, paragraph 11 of the act (now appearing as section 6132.10, paragraph [11] Mississippi Code of 1942) (1952) the Legislature gave the Oil and Gas Board authority "to regulate the spacing of wells and to establish drilling units."
This regulatory authority was then limited by section 9, chapter 256 of the Laws of 1948. Section 9 was amended by chapter 164, Laws of 1956 so that the statute now appears in its amended form as section 6132-21 Mississippi Code of 1942 Annotated. The statute provides in part as follows:
(a) The board shall have the power and authority and it shall be its duty, after due notice and a hearing, to regulate the drilling and location of wells in any pool and the production therefrom so as to prevent reasonably avoidable net drainage from each developed unit (that is, drainage which is not equalized by counter-drainage) so that each owner in a pool shall have the right and opportunity to recover his fair and equitable share of the recoverable oil and gas in such pool.
(b) For the prevention of waste, to protect and enforce the correlative rights of the owners in a pool, and to avoid the augmenting and accumulation of risks arising from the drilling of an excessive number of wells, or the reduced recovery which might result from two small a number of wells, the board shall, after a hearing, establish a drilling unit or units for each pool; provided, that the establishment of a unit for gas shall be limited and apply only to the production of gas and not oil.
(c) Each well permitted to be drilled upon any drilling unit shall be drilled in accordance with the rules and regulations promulgated by the board and in accordance with a spacing pattern fixed by the board for the pool in which the well is located with such exceptions as may be reasonably necessary... . The reasonable minimum amount of productive acreage shall be determined for all purposes as if each oil well drilling unit were a regular governmental quarter-quarter section, comprising forty (40) acres, more or less, and as if each gas well drilling unit were a regular governmental one half section, comprising three hundred twenty (320) acres, more or less, and shall be calculated for the purpose of each oil well drilling unit as being the total acreage which would be encompassed within a triangular shaped area bounded on two (2) sides by the exterior boundaries of such forty-acre drilling unit meeting at a 90° angle corner and on the third side by a straight line running on a 45° angle through a location point situated at the minimum distance out of such corner as shall be in accordance with prescribed oil well drilling unit footage limitations and intersecting each of such two (2) exterior boundaries at 45° angles, and shall be calculated for the purposes of each gas well drilling unit as being the total acreage which would be encompassed within a triangular shaped area bounded on two (2) sides by the exterior boundaries of such three hundred twenty-acre drilling unit meeting at a 90° angle corner and on the third side by a straight line running *790 on a 45° angle through a location point situated at the minimum distance out of such corner as shall be in accordance with prescribed gas well drilling unit footage limitations and intersecting each of such two (2) exterior boundaries at 45° angles. Should drilling units for any field or area be established so as to permit the drilling of oil or gas wells on smaller or larger units than 40 acre or 320 acre drilling units then, in such event, the same method of determining the reasonable minimum amount of productive acreage shall be applied to the consideration of such oil or gas drilling units with respect to the size of, and the prescribed footage limitations applicable to, such drilling units. (Emphasis added.)
The purpose of Section 6132-21, supra, was to prescribe the limits within which the Oil and Gas Board was authorized to operate with respect to spacing and prevention of waste. It was necessary for this limitation to be placed in the act to prevent an unconstitutional delegation of legislative authority. It is noted that Section 6132-21, supra, specifically provides that the Board shall hold a hearing and provide spacing for each pool, thus making its spacing regulations dependent upon a hearing pertaining to the facts existing in each separate pool.
It is common knowledge that many variables exist in each oil and gas pool so the Legislature wisely provided for a hearing by the Board to regulate the drilling in each pool to properly carry out the purposes of the act.
The Board may regulate spacing of wells in each pool for the prevention of waste, but may not provide for spacing of wells on a statewide basis. The above quoted sections are a prohibition on the power and authority of the Board to establish statewide rules with respect to spacing.
Paragraph 6132-35 Mississippi Code 1942 Annotated (1952), originally enacted as section 21, chapter 256, Laws of Mississippi 1948 provides as follows:
Chapters 117 [§§ 6132-6179, Code of 1942] and 129 [§ 6142, Code of 1942], laws of 1932, chapter 154, laws of 1934 [§ 6141, Code of 1942], chapter 305, laws of 1936 [§ 6140, Code of 1942], chapter 233, laws of 1944 [amending § 6134, Code of 1942], chapters 345 and 450, laws of 1946 [amending §§ 6134, 6164, Code of 1942], and all other laws and parts of laws in conflict herewith are hereby repealed. The repeal of said laws, however, shall not affect any rules, regulations or orders heretofore made by the state oil and gas board under the authority thereof, but all such rules, regulations and orders shall be and remain valid and effective for a period of only six (6) months from the effective date of this act, and their validity and effectiveness shall be as full and to the same extent as if the same were made and promulgated under the authority of this act; provided, however, that such rules, regulations or orders, or any of them, may be earlier amended, rescinded, or superseded by the board provided for herein.
Section 21 clearly provides that previous rules, regulations and orders enacted by the Board under the authority of laws then in effect, shall remain valid and effective for a period of only six months. It therefore, naturally follows that any regulation adopted prior to the enactment of Chapter 256, Laws of 1948, would exist for a period of six months in order to give the Board time to adopt new rules, regulations or orders as authorized by the act. Any rule, regulation or order adopted after the passage of the act would, of necessity, have to comply with the terms of the act.
The second reason for this dissent is that if a limitation were not placed on the power and authority of the Board it would be in violation of Article 4, Section 33 of the Mississippi Constitution of 1890 which is as follows:
The legislative power of this state shall be vested in a legislature which shall consist of a senate and a house of representatives.
*791 This Court has held that the Legislature cannot delegate legislative authority. State v. Allstate Insurance Company, 231 Miss. 869, 97 So.2d 372 (1957); Alcorn v. Hamer, 38 Miss. 652 (1860).
I am not unmindful of the opinion of this Court in California Company v. State Oil and Gas Board, 200 Miss. 824, 27 So.2d 542 (1946), which held that the provision in a prior act for appeal to the circuit court was constitutional in the following language:
However, under the well-settled principle that all presumptions should be indulged in favor of the validity of a statute, and that its unconstitutionality must appear beyond a reasonable doubt before it will be held to be invalid, and that the courts should give such a construction to a statute, if possible, as will uphold it, we are of the opinion that an appeal to the Circuit Court with authority "to approve or disapprove the action of the board" may be upheld by limiting its authority in that behalf to the right to conduct a hearing to the extent only of determining whether or not the decision of the administrative agency is supported by substantial evidence, is arbitrary or capricious beyond the power of the Board to make, or violates some constitutional right of the complaining party, as was held in Dixie Greyhound Lines, Inc., v. Miss. Public Service Comm. et al., 190 Miss. 704, 705, 200 So. 579, suggestion of error overruled in 1 So.2d 489.
In determining the questions above stated the Circuit Court would be acting judicially. To that end it may hear evidence to the extent of determining what state of facts the administrative body acted on at the time of the rendition of the decision appealed from. (Id. at 841, 842, 27 So.2d at 546).
The Court had previously stated that the Legislature had the right to delegate the legislative power to regulate spacing of oil and gas wells to a special administrative agency, but such statement was dictum because the Court stated the question for decision as follows:
Therefore, this Court is confronted with the necessity of determining (1) whether or not this provision for an appeal to the Circuit Court is unconstitutional in its entirety, or (2) whether or not the right of appeal in itself may be upheld as being within constitutional limitations by permitting the Circuit Court to merely approve or disapprove the decision appealed from on grounds hereinafter stated. (Id. at 839, 27 So.2d at 544).
In State v. Allstate Insurance Company, supra, this Court stated:

The traditional theory is that the legislature cannot delegate power to make law, but may delegate power to determine facts on which the law makes its own action depend. Clark v. State, 1934, 169 Miss. 369, 152 So. 820; Abbott v. State, 1913, 106 Miss. 340, 63 So. 667. Legislative power or functions may be delegated to an administrative agency only in the limited sense that the statute must set forth the legislative decision and must prescribe adequate standards or rules for the agency's guidance. It cannot be vested with an arbitrary and uncontrolled discretion. 73 C.J.S. Public Administrative Bodies and Procedures § 29. In other words, constitutional theory legitimizes the the [sic] situation by taking the position that constitutional provisions do not force upon the legislature and courts a monopoly of legislating and adjudicating; and that these functions in a restricted manner may be delegated to executive or administrative agencies by the acts of the legislature if the latter prescribe limits within which the administrative grantees are to operate. The principal doctrines involved are those respecting *792 the separation and delegation of powers, and both of these lead to the practical field of adequacy of legislative standards. That term is used to embrace statements of objective, policy or purpose, as well as definitions, specifications, requisites and limitations. In other words there should be a reasonably clear standard by which the discretion granted to the agency must be governed. Clark v. State, supra; Davis, Administrative Law (1951), Secs. 10-18; 42 Am.Jur., Public Administrative Law, Secs. 42-52. (231 Miss. at 882, 97 So.2d at 375-376.)
The action of the State Oil and Gas Board in adopting statewide rules pertaining to spacing of oil and gas wells, exceeds the most liberal interpretation of the standards announced above.
The reason for the prohibition against the delegation of legislative authority is to prohibit government by administrative agencies which are not directly responsible to the electors and thus not representative of the will of the people as expressed in Article 3, Section 5 of the Constitution of 1890:
All political power is vested in, and derived from, the people; all government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole.
Under our republican form of government the Legislature represents the people of Mississippi, and its power is derived from the people and is founded upon "their will only" as prescribed by the Constitution.
It is recognized in the complex society in which we live that it might be more expedient at times to delegate legislative authority to an administrative agency, but such is not authorized by the Constitution and should not be permitted either by legislative act or judicial opinion.
If the people of the State of Mississippi desire to have rules and regulations which have the effect of general law adopted by administrative agencies, this should be accomplished by constitutional amendment specifically authorizing such action.
In both the State and Federal government more and more administrative agencies are being created with broad powers that vitally affect the lives of the citizens. This practice removes government further and further from the "will of the people." The evils of this practice are apparent daily to our citizens from the smallest village to the largest city. Such delegation of power should be halted at every opportunity so that government will be, in fact as well as in theory, the "will of the people."
I fully recognize that this dissent is not in accord with the modern trend of constitutional decisions, but I am a strong believer in the fact that legislation by administrative agencies, not directly subject to the will of the people, constitutes one of the greatest threats to our freedoms today. The danger of oppression is far greater when laws are made by committees, insulated from the public will, than laws enacted by a representative legislature, subject to the public will.
I may be a little bit "old timey", but my view is that our Constitution vests the lawmaking power in the legislature, and none other.
Our rights and liberties should not be eroded by a liberal or unlawful delegation of lawmaking power to a group of persons who are not directly responsible to the "will of the people."
JONES, BRADY and PATTERSON, JJ., join in this dissent.
NOTES
[1] Miss.Code 1942 Ann. § 6132-08(g) (1952). "Owner" shall mean the person who has the right to drill into and produce from any pool, and to appropriate the production either for himself or for himself and another or others; "royalty owner" shall mean any person who possesses an interest in the production but who is not an "owner" as herein defined.