944 So.2d 92 (2006)
MISSISSIPPI STATE BOARD OF FUNERAL SERVICES, Appellant
v.
Kenny G. COLEMAN, JR., Appellee.
No. 2004-SA-02280-COA.
Court of Appeals of Mississippi.
May 16, 2006.
Rehearing Denied September 26, 2006.
Certiorari Denied December 14, 2006.
*95 Office of the Attorney General by Onetta Whitley, attorney for appellant.
Ralph Stewart Guernsey, Oxford, David L. Minyard, attorneys for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
IRVING, J., for the Court.
¶ 1. Kenny Glenn Coleman, Jr. applied for a Mississippi funeral service license, which the Mississippi State Board of Funeral Services (Board) denied after a hearing. Coleman appealed the decision to the Lafayette County Circuit Court, which reversed the decision of the Board as arbitrary and capricious. Aggrieved, the Board now appeals to this Court and asserts that the circuit court erred in reversing the Board's decision because the court improperly applied the Mississippi standard that governs judicial review of an agency's decision.
¶ 2. We agree, and reverse and render the decision of the circuit court.

FACTS
¶ 3. Coleman had been working at the Memphis Funeral Home and Cemeteries (Memphis) in Memphis, Tennessee, for a few months before he applied to the Board to begin his required training.[1] On his application, Coleman stated that he planned to do his training at the Brantley Funeral Home (Brantley) in Olive Branch, Mississippi, under the guidance of James L. Wray, a Mississippi-licensed embalmer who worked at Brantley. On a renewal application for his training, Coleman indicated that he had been working at Brantley and that he planned to continue working there. Coleman also filed several quarterly reports with the Board, detailing *96 the work that he was allegedly doing at Brantley.
¶ 4. Sometime in 2003, the executive director of the Board asked Gene Phillips, who was a Board member and manager at Brantley, how Coleman was doing in his training at Brantley. Phillips responded that he had met Coleman in Tennessee, but that Coleman was not, and had never been, employed at Brantley. Further investigation by the Board revealed that Coleman had never been employed by Brantley, although he had listed Brantley as his place of training on his application. The Board discovered that from May 2002 until March 2003, the time period covered by his applications, Coleman was actually working at Memphis under the guidance of Kevin Hughes, an employee at Memphis.
¶ 5. After uncovering the discrepancies between Coleman's application and his actual place of employment, the Board issued a notice to show cause, directing Coleman to present evidence as to why he should be given a funeral license in light of his actions. Coleman appeared at the February 2004 hearing with a lawyer he had retained. At the end of the hearing, the Board found clear and convincing evidence that Coleman had falsified information and had not completed his training. Consequently, the Board denied Coleman a license and directed that he not be allowed to apply for another license for two years, at which time he would also have to complete another twelve months of training. The Board also informed Coleman that, when he sought licensure again, none of his prior training would count toward his requirements. Coleman appealed the Board's decision to the Lafayette County Circuit Court, which reversed the Board.
¶ 6. The circuit court found that the decision of the Board was "arbitrary, capricious, unwarranted, wrong legally as well as morally, and shocks the conscience." In coming to its conclusion, the court noted that the licensing requirements do not state that the actual embalming of bodies must be done in Mississippi, only that the training must be done at a Mississippi-licensed facility. The court also found that the Board "knew, or should have known since it is responsible for periodic inspections of all funeral establishments, that Brantley Funeral Home had not embalmed a body since April, 1998 and therefore . . . they should have notified Coleman immediately that Brantley Funeral Home would not qualify as a place for his Apprenticeship." The court found that this was especially true because Phillips was both a manager at Brantley and a member of the Board.
¶ 7. The court also found that there was "no rational relationship between the Board's Order and its interpretation of the statute and the evident intent of the statute; the safe disposal of human remains and the protection of the consumer." The court noted that Coleman "thought he was serving an apprenticeship at Brantley Funeral Home in Olive Branch; that he was being supervised by duly licenses preceptors, and there is nothing within this record to find that Coleman has been untruthful, dishonest, fraudulent or improper. . . ." Finally, the court found that "[t]he severity of the punishment contained in the Board's Order appears unusually harsh and therefore the Court finds that the Order and Decision evinced bias or prejudice toward Coleman. . . ."

ANALYSIS AND DISCUSSION OF THE ISSUE[2]
¶ 8. When reviewing the action of an administrative agency, a court should *97 refuse to uphold the decision if: (1) the decision is not supported by substantial evidence, (2) the decision is arbitrary and capricious, (3) the decision was beyond the scope or power granted to the agency, or (4) the decision violated one of the claimant's constitutional rights. Allen v. Miss. Employment Sec. Comm'n, 639 So.2d 904, 906 (Miss.1994). The agency is presumed to be correct, and "the challenging party has the burden of proving otherwise." Id. (citing United Cement Co. v. Safe Air for the Env't, 558 So.2d 840, 842 (Miss.1990)). In reviewing the agency's decision, the court "must not reweigh the facts of the case or insert its judgment for that of the agency." Id. (citing Miss. Pub. Serv. Comm'n v. Merchs. Truck Line, Inc., 598 So.2d 778, 782 (Miss.1992)).
¶ 9. With this standard in mind, we turn to an analysis of each of the above considerations.
Substantial Evidence
¶ 10. In order to be upheld, an agency's decision must be supported by substantial evidence. In this context, "substantial evidence" has been taken to mean "such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." Miss. Dep't of Human Servs. v. McNeel, 869 So.2d 1013, 1018 (¶ 19) (Miss.20004) (quoting State Oil & Gas Bd. v. Miss. Mineral and Royalty Owners Ass'n, 258 So.2d 767, 779 (Miss. 1971)).
¶ 11. After reviewing the transcript of Coleman's hearing before the Board, we find that the Board's decision was clearly supported by substantial evidence. Coleman wrote on both his initial application and his renewal application that he was receiving training at Brantley. It was clear, however, that Coleman was actually employed and training at Memphis. This evidence came not only from numerous witnesses and documents, but also from Coleman's sworn testimony. In finding as it did, the circuit court impermissibly reweighed evidence and substituted its own judgment for that of the Board's.
¶ 12. Coleman's applications and quarterly reports indicated that he was performing his training at Brantley by carrying out various procedures there, when, in fact, those activities were taking place entirely at Memphis. Dolores Kenny, executive director of the Board, testified that "the funeral directing activities and embalming activities would have indicated that they had been performed at this particular establishment [Brantley]." In other words, the Board would not have interpreted Coleman's reports to mean that he was performing the listed activities anywhere other than at Brantley.
¶ 13. Kenny also testified about her conversation with Phillips, when it was discovered that Coleman did not actually work at Brantley and was unknown by most of the staff there. Phillips himself testified at the hearing that he knew Coleman because he "was introduced to him by Keven Hughes at the Memphis Service Center, when he started being employed there." Phillips testified that he would *98 have known any trainee at Brantley, but that, to his knowledge, Coleman had never been an employee at Brantley, and would have only been at Brantley if he was there to bring a body down from Memphis.
¶ 14. The Board received a letter from a manager at Memphis, confirming that Coleman was employed in Memphis and had never worked for Brantley. At the hearing, another manager from Memphis testified that Coleman "worked for us in our preparation room [at the Memphis facility]." The manager went on to testify that Coleman had never been an employee at Brantley, but had always been employed at Memphis. On cross-examination, the manager was asked if he could "state with absolute certainty that [Coleman] did not work at times in Brantley." The manager responded that any work done by Coleman at Brantley was "seldom." Coleman's attorney attempted to clarify the manager's statement by asking: "If a customer came to the Brantley location, Mr. Coleman would have to go to Memphis to do the embalming?" The manager clearly responded: "No, he would already be at Memphis 'cause that's where he worked." (emphasis added). The manager also testified that Coleman had often worked around forty hours per week at Memphis, and therefore could not have been working those same hours at Brantley.
¶ 15. In response to a request from the Board, the management at Brantley verified in writing that Coleman had never been employed at Brantley. Additionally, the pay stubs contained in the record clearly stated that they were from the Memphis funeral home. Phillips testified at the hearing that employees at the Brantley funeral home received pay stubs from "SCI, Mississippi."
¶ 16. Most damaging of all are the admissions made by Coleman during the hearing. When asked why Hughes had not been identified on his application, Coleman stated that he had not included Hughes because "he was employed at the preparation there on Summer Avenue [in Memphis]." Coleman testified that, before sending in his application, he considered himself to be an employee at Memphis, even adding "[t]hat's where I received my check from." When asked if there was any change in that status at the time when he sent in his application to the Board, Coleman responded that "[o]ther than work done from part-time and full-time, no, ma'am." Coleman further testified that, despite the fact that he worked on bodies from Brantley, he was "not employed" at Brantley and dealt with the Brantley bodies only in Memphis. Coleman testified that his interview for his position had occurred in Memphis with Hughes, and not at Brantley with a Brantley employee.
¶ 17. Despite the fact that Coleman put Wray as his supervisor on his application, he testified at the hearing that Wray supervised only fifteen to twenty percent of his procedures, while Hughes oversaw one hundred percent of his activities. When questioned by the Board as to how, in light of those percentages, Coleman could consider his quarterly reports to be accurate, Coleman responded that it was "because [Wray] maintained a close contact with Mr. Hughes." Coleman thereafter testified that he was fully aware that Hughes did not work at Brantley, but worked at Memphis.
¶ 18. The Board questioned Coleman: "when you signed that form [the quarterly report] . . . were you indicating that the work was done at Brantley Funeral Home? Did you sign it saying that you were an employee of Brantley Funeral Home and the work was done there?" When Coleman seemed unable to adequately *99 respond to this question, the chairman who had asked the question clarified: "I want to know how you signed it. Did you sign it as a trainee at Brantley Funeral Home and that the bodies were embalmed there?" Coleman's response to this question was distinctly unhelpful and evasive: "I don't know if I  I didn't mean it like that, if that's what it is, is what I'm saying. I mean what it says is what it says." (emphasis added).
¶ 19. After the hearing, the Board issued its decision refusing Coleman a funeral service license. The Board noted that there was
clear and convincing evidence that during the period between May 25th, 2002, through March 28th, 2003, Kenny G. Coleman, Jr., . . . was employed by Memphis Funeral Home and Cemeteries at its central preparation center in Memphis, Tennessee, and not at Brantley Funeral Home. . . . And in so indicating [that he was employed at Brantley], Glenn Coleman . . . made false statements to the Board.
As punishment, the Board denied Coleman's license and ordered that he would "not be eligible to start a period of new apprenticeship or licensing requirements for a period of twenty-four months from this date," and "[a]ny past training or service completed will not be recognized as any future credit for completion of these requirements. . . ."
¶ 20. Coleman contends that the imputed knowledge of the Board that his training would not be valid is sufficient to uphold the circuit court's ruling. He argues that this is especially so because the State does not, according to him, refute this argument in its brief. However, we note that the State's brief clearly states [as a response to the court's finding that the Board should have known that the training would not be sufficient]:
Periodic inspections of funeral establishments are conducted at least once each licensing period, which is a two year period of time. There is nothing in the record that supports the courts [sic] contention that the Appellant knew or should have known that no embalming was performed at Brantley. What the record does show is that Brantley Funeral Home contained all of the necessary components and equipment with which to perform embalming. That no embalming was performed at Brantley Funeral Home was the result of an administrative policy or business decision of the funeral establishment. There was nothing to physically prevent this activity from taking place there. There is nothing in the record that supports the contention that the Appellant was aware of Brantley's policy prior to the initiation of this investigation. Even assuming an awareness on the part of the Appellant, Appellant was under no affirmative duty to inquire of the arrangement made between Appellee and Brantley, that is to say, that as far as the Appellant knew or should have known, a licensee of the Appellant, employed at a licensed establishment, represented that he would supervise the Appellee's training; and that that training would take place at Brantley Funeral Home.
We agree. There was substantial evidence that the Board was not aware of any problem with Coleman's application prior to learning that his training was not being done where he had indicated.
¶ 21. The statute governing funeral service licensing is Mississippi Code Annotated section 73-11-57, which states that the Board may refuse to issue a license after finding "[t]he employment of fraud or deception in applying for a license. . . ." Miss.Code Ann. § 73-11-57(1)(a) (Supp.2005). The section also *100 states that a license may be refused upon a finding of any "unprofessional conduct which includes . . . [a]ny act or conduct . . . which constitutes or demonstrates bad faith, incompetency or untrustworthiness; or dishonest, fraudulent or improper dealing. . . ." Id. at (1)(n)(v). Coleman contends that the hearing shows "no evidence" of his "intent to deceive," and, therefore, there was no substantial evidence supporting the Board's decision to refuse his license.
¶ 22. Coleman first points to the comments of Chairman Riles, who stated that Coleman "has been honest with me, as far as he would know." However, Riles could not speak for the whole of the Board in making this comment, and the Board's interpretation of Coleman's actions is clear from its decision refusing to grant Coleman a license and its finding that he had knowingly provided false information. Coleman also points to the comments of the State's attorney during her closing statement, indicating that she felt there was an issue as to Coleman's culpability. However, it is the decision of the Board that the reviewing court must look at, not the passing arguments of counsel opposite. After reviewing the record, we find that there was substantial evidence from which the Board could discern Coleman's "intent to deceive." Furthermore, the statute requires only that the Board find Coleman guilty of "unprofessional conduct." The evidence adduced at the license hearing was more than sufficient to establish substantial evidence of Coleman's unprofessional conduct.
¶ 23. Coleman also asserts that the Board did not establish the materiality of the false information he supplied in his application: "what difference, as to materiality, could it make for training purposes as to whether Glenn trained in Memphis, or five miles south in Olive Branch? To parody the late Johnny Cochran, `If it doesn't matter, ignore the Board's chatter.'" Since the Mississippi Code requires that Coleman's training take place in a Mississippi-licensed funeral facility, the material difference between what Coleman put on his application and what he actually did is significant. The requirement is that the training take place in a Mississippi-licensed facility, not any facility within six miles of Mississippi, as Coleman would apparently have us hold.
¶ 24. Coleman also compares his case to that of Miss. State Bd. of Dental Exam'rs v. Mandell, 198 Miss. 49, 21 So.2d 405 (1945). In Mandell, the Mississippi Supreme Court affirmed a chancery court's decision that reversed the State Board of Dental Examiners's denial of a license to Mandell. The board denied the license because it found that Mandell lied in: (1) stating that he was "reared" in the United States, when, in fact, he was older than twenty when he moved to the United States; (2) stating on his application that he had attended two years at Johns Hopkins, when he had attended the school under a different name; (3) improperly placing the names of two men as references at the end of his application when Mandell did not personally know either of the men; and (4) practicing dentistry under an assumed name. Id. at 62-63, 21 So.2d at 408-09. The court upheld the chancery court, finding that all of the above were mistakes or mere technicalities: "reared" does not necessarily mean that one lived in the United States as a small child, according to the dictionary; Mandell did attend Johns Hopkins, despite the fact that he had done so before Americanizing his name; a colleague of the two men had offered them to Mandell as references; and his name was legal, especially in light of the fact that it was an Americanization of his given name. Id. at 65-70, *101 21 So.2d at 409-11. The court specifically excused conduct that consists of "only an error of judgment, with no bad or evil purpose. . . ." Id. at 65, 21 So.2d at 409.
¶ 25. Coleman's situation is significantly different from Mandell's. Intentionally writing the name of a Mississippi funeral home on his application, which Coleman himself admits he did not work at, simply does not constitute "only an error of judgment." Also, Coleman did not limit his false representations to misrepresenting his place of employment, but he also intentionally misrepresented the identity of his supervisor, because his primary supervisor did not work in Mississippi. After reviewing the record, there was no error on the part of the Board in determining that Coleman's repeated lies were not mere mistakes. Therefore, Mandell provides no relief to Coleman.
¶ 26. Coleman also contends that the Board's holding seeks "to prohibit the transportation of dead bodies. . . ." However, nothing in the Board's findings or rulings punished Brantley for doing its embalming in Tennessee. In fact, the State confirmed that it had no problem with the transportation of dead bodies across state lines. The problem was with Coleman's false statements on his application and quarterly reports indicating that he was working at a facility that he himself admits he did not work at. The Board specifically indicated that Coleman was being punished for making "false statements;" no mention was made that Coleman was being sanctioned for having performed embalming outside Mississippi.
¶ 27. Coleman points to the fact that he began his Memphis training before the amendment to the statute that required that training take place in a Mississippi-licensed establishment. He argues that the amendment to the statute cannot apply to him because he began working before the amendment took place. However, Coleman's application was filed after the amendment to the statute. Therefore, at the time when Coleman was seeking approval for his statutorily-required training, that trainingby statutehad to take place in a Mississippi-licensed funeral home. It is undisputed that the Tennessee funeral home is not licensed in Mississippi.
¶ 28. Coleman states correctly that when "a law is misconstrued by an administrative agency, the reviewing Court should not hesitate to review the legal issue de novo." However, we cannot find where the Board misconstrued any law of the State of Mississippi. Coleman contends that "substantial evidence" cannot be proved by "mere surmise, conjecture, speculation or suspicion. . . ." (citing Miss. Real Estate Comm'n v. Ryan, 248 So.2d 790 (Miss.1971)).
¶ 29. The Ryan court stated: "In order to take or suspend the license of a real estate broker under a charge of bad faith, incompetency or untrustworthiness, or dishonest, fraudulent or improper dealings, the proof . . . must clearly establish the guilt of the respondent. Proof of surmise, conjecture, speculation or suspicion is not sufficient." Ryan, 248 So.2d at 793. The court stated separately that "substantial evidence" must be "more than a scintilla; it must do more than create a suspicion, especially where the proof must show bad faith." Id. at 794. The language that Coleman is clearly referring to, and in fact quoting, relates to the proof necessary to revoke a license on the grounds of bad faith or fraud.
¶ 30. We note again Coleman's own admissions under oath that he knew he was employed in Tennessee and not Mississippi, and intentionally filled in the name of a Mississippi funeral home which he was fully aware he was not employed by. *102 Therefore, regardless of exactly what burden of proof the Board was required to meet, its decision was clearly based on more than conjecture, speculation, or suspicion. The testimony of numerous individuals that Coleman did not work at Brantley, Coleman's admission that he knew he did not work at Brantley, and Coleman's inability to adequately explain why he falsely put on his application that he worked at Brantley clearly provided more than substantial evidence to support the Board's decision.
¶ 31. In the interest of completeness, we briefly address the fact that Brantley and Memphis were both owned by the same parent corporation, SCI. However, Coleman's own testimony did not indicate that he thought his training was valid because he was simply working for a different branch of one company. Whether owned by the same parent company as Brantley, Memphis was clearly not a Mississippi-licensed funeral home, and could not provide an adequate location for Coleman's training.
Arbitrary and Capricious
¶ 32. A reviewing court is also to look at whether the decision of an administrative agency was "arbitrary or capricious." However, Mississippi case law has firmly established that decisions which are supported by substantial evidence cannot be arbitrary or capricious: "If an agency's decision is supported by substantial evidence, then it is not arbitrary or capricious." Pannell v. Tombigbee River Valley Water Mgmt. Dist., 909 So.2d 1115, 1122(¶ 21) (Miss.2005) (quoting Miss. Transp. Comm'n v. Anson, 879 So.2d 958, 964(¶ 17) (Miss.2004)); Pub. Employees' Ret. Sys. v. Stamps, 898 So.2d 664, 675(¶ 36) (Miss.2005).
¶ 33. Since we have found that the agency's decision was, in fact, supported by substantial evidence, we also find that the decision was not arbitrary or capricious. Therefore, the circuit court erred in finding the Board's decision arbitrary and capricious.
Scope or Power of the Agency
¶ 34. In order to withstand judicial review, an agency's decision must also be within the scope or power granted to the agency or board. Mississippi Code Annotated section 73-11-57 (Rev.2004) gives the Board the authority and power to issue, revoke, and renew licenses. Therefore, the decision refusing a funeral license to Coleman was within the power granted by statute to the Board.
Coleman's Constitutional Rights
¶ 35. Finally, the Board's decision must not violate any of Coleman's rights. We note that Coleman was issued a notice to show cause, and a hearing was set in this matter. At the hearing, Coleman was allowed to present his own witnesses as well as to question the Board's witnesses. He was also allowed to present other forms of evidence. Furthermore, an attorney was present at the hearing to protect Coleman's rights. Therefore, the actions of the Board did not violate any of Coleman's statutory or constitutional rights; his due process concerns were adequately addressed.
Other Matters
¶ 36. Coleman also contends that we cannot reverse the decision of the circuit court because the Board eventually granted his license, pursuant to the circuit court's decision. Coleman contends that the Board could have superceded the court's order and refused to grant Coleman a license, despite having been ordered to do so. From this, Coleman argues: "Since the Board granted Glenn's license *103 after perfecting its appeal, it may not now revoke the license without a new accusation of culpability." (emphasis in original). We disagree.
¶ 37. First, our reversal and rendering of the circuit court's decision negates the order of the court requiring the Board to issue a license to Coleman. Second, Mississippi Code Annotated section 73-11-57(1)(b) clearly states that the Board may revoke a license upon "[t]he erroneous issuance of a license to any person. . . ." Coleman argues that this section requires a finding as to the guilt of the licensee. However, Coleman is guilty of receiving an erroneously-issued license, since the Board's decision to refuse his license was proper and should not have been reversed by the circuit court. Coleman's contentions that the Board cannot now revoke his license are without merit.
¶ 38. In summary, we find that the circuit court erred in substituting its own judgment for that of the Board and in improperly reweighing facts. Under the Mississippi standard of judicial review of an agency's decision, the Board's decision clearly should have been upheld. The circuit court erred in holding otherwise.
¶ 39. THE JUDGMENT OF THE LAFAYETTE COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] Applicants for a funeral service license are required to complete twelve months of training at a Mississippi-licensed facility as a prerequisite to licensure. Miss.Code Ann. § 73-11-51(4)(d) (Rev.2004).
[2] In its summary of the issues, the Board listed three issues: (1) whether the court erred in reversing the decision of the Board, (2) whether the court erred in substituting its judgment for the Board's, and (3) whether the court erred in not giving deference to the decision of the Board in interpreting statutes that it has been assigned control over. However, the Board never addressed the second and third issues in its brief. Additionally, since we find error on the basis of the first issue, it is unnecessary for us to address the second and third issues.